UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - :
RICO COX,                              : 06 Civ. 3159 (PAC)(JCF)
                                       :
                 Petitioner,           :      REPORT AND
                                       :      RECOMMENDATION
       - against -                     :
                                       :
ROBERT EBERT, Superintendent,          :
Otis Correctional Facility,            :
                                       :
                 Respondent.           :
- - - - - - - - - - - - - - - - - - - - :

TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:

        Rico Cox brings this petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254, challenging his conviction in New
York State Supreme Court, Bronx County, for manslaughter in the
first degree and attempted murder in the second degree.  Mr. Cox
contends that (1) the prosecution withheld exculpatory evidence in
violation of Brady v. Maryland, 373 U.S. 83 (1963), (2) the
prosecution knowingly used perjured testimony to secure his
conviction, (3) the trial court abused its discretion in refusing
reopen a hearing on a motion to vacate the conviction, (4) he was
denied effective assistance of counsel at trial and on appeal in
violation of the Sixth Amendment, and (5) the prosecution failed to
prove his guilt beyond a reasonable doubt.  For the reasons set
forth below, I recommend that the petition be denied.

1

Background

    A.   The Incident

At approximately 5:00 p.m. on March 16, 1993, Rico Cox, accompanied by Leon Hardy and a third man, confronted Ervin Edwards and Darren Dingle. (Tr. vol. 2 at 152-53).[1] The encounter took place in a courtyard outside Mr. Dingle's residence which serves as the entrance to 1162 and 1164 Sheridan Avenue in the Bronx. (Tr. vol. 2 at 152, 160). After a brief argument, Mr. Cox and Mr. Edwards engaged in a fist fight while the others looked on. (Tr. vol. 2 at 154). In the course of the fight, Mr. Hardy and the third man pulled out guns, whereupon Mr. Dingle fled the scene. (Tr. vol. 2 at 156). As Mr. Dingle ran away, Mr. Hardy started to pursue him and fired some shots in his direction. (Tr. vol. 2 at 156-57).

At the scene, Mr. Edwards lay wounded, balled up in fetal position, blood flowing from his stomach, chest, and mouth. (Tr. vol. 2 at 84, 132). A friend of his, Aaron "Bucky" Fields, saw him lying there and asked what had happened, to which Mr. Edwards responded, "Rico." (Tr. vol. 2 at 83-84). At that moment, Police Officer William Carson, the first policeman to reach the scene, pulled Mr. Fields away to attend to Mr. Edwards. (Tr. vol. 2 at

---

[1] "Tr." refers to the transcript of the petitioner's second trial, which consists of two volumes. The transcript of the voir dire is included in the first volume.

84, 132). Soon thereafter, medical personnel arrived, and Mr. Edwards was carried into an ambulance. (Tr. vol. 2 at 134). Mr. Fields managed to climb in with Mr. Edwards and questioned him again about what had happened. (Tr. vol. 2 at 84). Mr. Edwards said, "Rico man just wild out. He just flipped and went crazy." (Tr. vol. 2 at 84-85, 87). Mr. Edwards sustained two lethal gun shot wounds to his abdomen and one wound to the forearm. (Tr. vol. 2 at 120-23). He died later that evening. (Tr. vol. 2 at 72). On March 25, 1993, Mr. Cox and Mr. Hardy were apprehended in Albany, New York, but the third man was never arrested. (Tr. vol. 2 at 70-71). Mr. Hardy pled guilty to second degree attempted murder in February 1995. (Affidavit of Christopher J. Blira-Koessler dated Oct. 12, 2006 ("Blira-Koessler Aff."), ¶ 5).

    B. <u>The Trials</u>

Mr. Cox was charged with one count of second degree murder and one count of first degree manslaughter relating to the death of Ervin Edwards, and one count of second degree attempted murder relating to Darren Dingle. At Mr. Cox's first trial, in March and April of 1995, the jury acquitted him of the second degree murder charge but was unable to reach a verdict on the remaining counts, and a mistrial was declared. (Court Worksheet dated April 1995, attached as Exh. 2 to Blira-Koessler Aff.). In September 1996, Mr. Cox was tried again on the first degree manslaughter and second

degree attempted murder counts.

At the second trial, Darren Dingle testified that, on March 16, 1993, Mr. Edwards came to his house, and the two of them stepped outside, where they encountered Mr. Cox, Mr. Hardy, and a third unidentified person.  (Tr. vol. 2 at 152-54).  After a brief argument, Mr. Edwards said to Mr. Cox, "Let's set it off," and the two of them engaged in a fistfight.  (Tr. vol. 2 at 154).  Mr. Dingle testified that, during the fight, he stood off the to side and made sure the others did not intervene so that the fight would be "fair."  (Tr. vol. 2 at 154-55).  After a couple of minutes, Mr. Dingle saw Mr. Hardy and the third man pull out guns, so he ran away.  (Tr. vol. 2 at 155, 163).  As he ran, Mr. Dingle heard two gun shots, and when he turned around he saw Mr. Hardy chasing him.  (Tr. vol. 2 at 156).  Mr. Dingle continued to run, and Mr. Hardy fired four shots in his direction.  (Tr. vol. 2 at 157, 171).  Mr. Dingle ran until he slipped on some ice and fell.  (Tr. vol. 2 at 156-58).  After staying down for a while, he backtracked to the courtyard and saw Mr. Edwards being loaded onto an ambulance.  (Tr. vol. 2 at 158).  On both direct and cross-examination, Mr. Dingle testified that because he was busy watching Mr. Hardy and the third man, he did not see the actual fight between Mr. Cox and Mr. Edwards, nor did he see Mr. Cox pull out a gun at any time.  (Tr. vol. 2 at 155, 161).

Officer Carson testified that upon arriving on the seen, he asked Mr. Edwards for his name.  Then Mr. Edwards asked, "I'm gonna die, ain't I?"  (Tr. vol. 2 at 133), and Officer Carson responded, "You don't look too good, who shot you?"  Mr. Edwards answered, "Rico Cox shot me"  (Tr. vol. 2 at 133), and  told Officer Carson that Mr. Cox lived at the Roosevelt Gardens on 171st Street and the Grand Concourse.  (Tr. vol. 2 at 134).

The prosecution also called as a witness Makeda Clarke, a young woman who was thirteen years old at the time of the shooting and who lived on the fifth floor of a building with a view of the courtyard.  (Tr. vol. 2 at 188, 229).  When the prosecution first asked Makeda whether anyone who was at the scene of the crime was sitting in court, she answered "No."  (Tr. vol. 2 at 190).  The trial judge then granted Assistant District Attorney ("A.D.A.") Allen Karen's request to confer privately with Makeda and to refresh her memory with her Grand Jury testimony.  (Tr. vol. 2 at 194-95).  When she returned to the stand, Makeda testified that she saw Mr. Edwards and Mr. Cox fighting, and that Mr. Cox had a gun in his hand.  (Tr. vol. 2 at 209-11).  A.D.A. Karen then asked Makeda whether she had seen Mr. Cox fire any shots with the gun.  (Tr. vol. 2 at 211).  Again, Makeda needed to have her recollection refreshed before she answered affirmatively.  (Tr. vol. 2 at 211-12).  When asked who Mr. Cox was firing at, Makeda replied, "I

don't know.  I know the gun was -- hitting the floor."  (Tr. vol. 2 at 213).

During cross-examination, defense counsel Benjamin Heinrich challenged Makeda's testimony in a number of ways, pointing out several discrepancies between her testimony and prior statements she had made to the Grand Jury and at the petitioner's first trial. (Tr. vol. 2 at 218-21, 224-28).  Counsel's cross-examination culminated when he asked Makeda:

> Q: Have you been told that if you didn't testify here today the same as you testified in the past that you would get in trouble?
>
> A: Yes.
>
> Q: And that is why you are here telling us that you saw this event?
>
> A: Yes.
>
> Q: Isn't the truth really that you only heard rumors about what happened afterward and that as a thirteen year old you decided you saw it happen and you decided to tell them that you saw it when you really did not witness this event?
>
> A: Yes.

(Tr. vol. 2 at 232).  Upon further prodding, this time by the court, Makeda said, "I saw [Rico Cox] with a gun. . . . I didn't see him shoot nobody.  But I saw the other boy shoot somebody -- because the gun was down."  (Tr. vol. 2 at 234).

At the close of testimony, the defense moved to dismiss both counts against Mr. Cox for failure to establish a prima facie case

as to each of the elements.  (Tr. vol. 2 at 261).  While stating that his belief that Mr. Dingle's testimony would not suffice on its own to make out acting in concert for the attempted murder charge, the judge denied the motion "in view of the testimony furnished by . . . Makeda Clarke."  (Tr. vol. 2 at 261-62).

On September 24, 1996, the jury found Mr. Cox guilty of first degree manslaughter in connection with the death of Ervin Edwards and second degree attempted murder relating to the shots fired at Darren Dingle.  (Tr. vol. 2 at 397).

C.   Procedural History Following Trial

In March 1997, the petitioner moved to set aside the verdict pursuant to New York Criminal Procedure Law ("CPL") § 330.30, claiming that the jurors engaged in improper discussions of the evidence and formed opinions prior to the deliberations.  Two alternate jurors who did not deliberate testified in separate hearings.  They both stated that there was some confusion among the jurors as to whether a witness had said "Rico's man" or "Rico man". (H1 at 9; H2 at 6-7).[2]  Jurors had also commented on the fact that one witness "seemed frightened," (H1 at 12), or "appeared to be nervous."  (H2 at 9).  One alternate juror testified that another

---

[2]  H1 and H2 refer to transcripts of two hearings on the petitioner's motion to set aside the trial verdict dated March 24, 1997 and March 27, 1997, respectively.  H3 refers to the transcript of a hearing on the petitioner's first motion to vacate in November 2000.

alternate had asked jurors how they planned to vote but was not successful in eliciting any response. (H1 at 13). On March 27, 1997, the court denied the petitioner's motion to set aside the verdict and sentenced Mr. Cox to concurrent indeterminate prison terms of eight and one third to 25 years. (H2 at 28, 34-35).

In April 2000, Mr. Cox retained Andrew Rossmer as counsel and moved to vacate his conviction pursuant to CPL § 440.10(1)(f) and (h), citing <u>Brady</u>[3] and <u>Rosario</u>[4] violations. Specifically, he argued that the prosecution had failed to disclose (1) an Unusual Occurrence Report which did not mention Mr. Edwards's statement that Rico Cox had shot him, (2) statements allegedly made to the prosecution by Makeda Clarke's mother, Dorrett, indicating that her daughter had not witnessed the shooting, and (3) Makeda Clarke's criminal record. (Affirmation of Andrew Rossmer dated April 10, 2000 ("First Motion to Vacate"), attached as Exh. 3 to Blira-Koessler Aff.). A hearing was held over several days in November 2000, during which Mr. Cox's trial counsel, Mr. Heinrich, and Dorrett Clarke testified.

---

[3] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), stands for the principle that, in a criminal case, the prosecution has a duty under the Fourteenth Amendment to reveal any material evidence favorable to the defendant.

[4] <u>People v. Rosario</u>, 9 N.Y.2d 286, 289, 213 N.Y.S.2d 448, 450 (1961), requires that the prosecution disclose any prior statements made by any of its witnesses relating to the subject matter of the witness's testimony.

After the hearing, but before the court had rendered its decision, Mr. Cox, acting pro se, sent a letter requesting that the court consider a sworn affidavit by Makeda Clarke that Mr. Cox enclosed with the letter. (Letter of Rico Cox dated Nov. 29, 2000, attached as Exh. 6 to Blira-Koessler Aff.). Mr. Cox alleged that Mr. Rossmer had not let him review the affidavit until after the hearing was over and failed to introduce it into evidence. In her affidavit, Makeda stated that she in fact had not seen the shooting take place, that she had told this to A.D.A. Karen, but that he had used a prior arrest record to coerce her into testifying at trial. (Affidavit of Makeda Clarke dated Nov. 27, 2000 ("Makeda 11/27/00 Aff."), attached as Exh. 5 to Blira-Koessler Aff.). The court declined to review Makeda Clarke's affidavit on the grounds that the hearing was closed but suggested Mr. Rossmer file a separate affidavit on the matter. (Letter of Peter J. Austin, Law Clerk to Justice Joseph A. Cerbone, dated Dec. 5, 2000, attached as Exh. 7 to Blira-Koessler Aff.). Mr. Rossmer did not file any affidavit, and Mr. Cox moved pro se pursuant to New York Civil Practice Law and Rules ("CPLR") § 2221 for rehearing on his motion to vacate. (Letter of Rico Cox dated Dec. 13, 2000, attached as Exh. 9 to Blira-Koessler Aff.).

The court declined to entertain Mr. Cox's application and eventually denied the motion to vacate in its entirety, finding

that (1) the defense had in fact received a copy of the Unusual Occurrence Report, (2) Dorrett Clarke was not a credible witness, and (3) A.D.A. Karen was unaware of Makeda's prior conviction because it had been recorded under another name and date of birth. (Decision and Order dated Dec. 18, 2000 ("First § 440.10 Decision"), attached as Exh. 8 to Blira-Koessler Aff. at 5-6).

In November 2001, Mr. Cox, now represented by William Robedee, appealed his conviction and the denial of his motion to vacate. The petitioner argued to the Appellate Division, First Department that (1) the prosecution failed to turn over information in violation of Brady and knowingly relied on perjured testimony, (2) the evidence against him was insufficient as a matter of law, (3) the trial court handled Makeda Clarke's testimony in a prejudicial manner, (4) trial counsel was ineffective for failing to effectively cross-examine Officer Carson, and (5) the court improperly declined to entertain his pro se motion to re-open the § 440.10 hearing. (Brief of Defendant-Appellant, attached as Exh. 10 to Blira-Koessler Aff.). The Appellate Division affirmed the judgment on September 24, 2002, stating that "the verdict was based on legally sufficient evidence," that "there were no violations of the [prosecution's] disclosure obligations," and that "trial counsel provided meaningful representation." People v. Cox, 297 A.D.2d 589, 589, 747 N.Y.S.2d 178, 178-79 (1st Dep't 2002). The

court also found that Mr. Cox's motion to vacate was properly
denied, "since the additional document defendant wished to
introduce should have been introduced at the proper time and would
not, in any event, have affected the result of the hearing."  <u>Id.</u>
at 589, 747 N.Y.S.2d at 179.  Thereafter, the New York Court of
Appeals denied leave to appeal.  <u>People v. Cox</u>, 99 N.Y.2d 557, 754
N.Y.S.2d 209 (2002).

    In February 2004, proceeding <u>pro</u> <u>se</u>, Mr. Cox submitted an
application for a writ of error coram nobis seeking to set aside
the verdict on grounds that he was denied the effective assistance
of appellate counsel.  He pointed to counsel's failure to raise
double jeopardy and <u>Antommarchi</u>[5] claims.  The Appellate Division
denied the motion and Mr. Cox's subsequent application to reargue
the motion (Decisions dated April 14 and June 23, 2005,
respectively, attached as Exhs. 21 and 23 to Blira-Koessler Aff.),
and the Court of Appeals denied leave to appeal.  (Decision dated
June 24, 2005, attached as Exh. 26 to Blira-Koessler Aff.).  Mr.
Cox's subsequent application for reconsideration of the decision
denying leave to appeal was also denied.  (Decision dated Aug. 30,
2005, attached as Exh. 28 to Blira-Koessler Aff.).

    In July 2005, after receiving records in response to a Freedom

---

[5] <u>People v. Antommarchi</u>, 80 N.Y.2d 247, 250, 590 N.Y.S.2d 33, 35
(1992), establishes a defendant's right to be present during
sidebar conferences with prospective jurors during voir dire.

11

of Information Law request, Mr. Cox retained Patrick Okeke to file a new motion to vacate his conviction pursuant to CPL § 440.10(1)(b), (c), (f), and (h).  In it, he claimed that (1) the prosecution had violated Brady and Rosario, (2) Makeda Clarke's testimony was false and had been procured by coercion, (3) his conviction had been obtained by the knowing use of perjured testimony, and (4) he had been denied effective assistance of trial counsel.  (Motion to Vacate Judgment pursuant to CPL § 440.10 ("Second Motion to Vacate"), attached as Exh. 29 to Blira-Koessler Aff.).  This motion was denied (Decision dated Dec. 5, 2005, attached as Exh. 33 to Blira-Koessler Aff.), as was his application for leave to appeal the denial of the motion.  (Decision dated Feb. 14, 2006, attached as Exh. 35 to Blira-Koessler Aff.).

Mr. Cox filed the instant petition on February 27, 2006.  I initially determined that the petitioner's claim of ineffective assistance based on appellate counsel's failure to assert an Antommarchi claim had potential merit and that an evidentiary hearing might be warranted.  Accordingly, I appointed Ronald Garnett to represent Mr. Cox in connection with that claim and any others the Mr. Garnett deemed appropriate.  (Memorandum and Order dated April 9, 2007).  However, on August 10, 2007, the respondent submitted a previously unavailable transcript from the petitioner's trial which revealed that Mr. Cox had waived his Antommarchi rights.  This rendered the evidentiary hearing unnecessary, and I

relieved Mr. Garnett as counsel on August 31, 2007.  (Memorandum

and Order dated Aug. 31, 2007).  At that time, the petition was

fully submitted.

Discussion[6]

    A.   Brady Claims

    Mr. Cox cites a number of ways in which the prosecution

allegedly violated his rights under Brady.[7]  Specifically, he

_____

[6] Prior to passage of the Antiterrorism and Effective Death Penalty
Act (the "AEDPA"), factual findings made by a state court after an
evidentiary hearing were presumed correct in a federal habeas
proceeding, however, federal courts were not required to defer to
state court determinations of law and of mixed questions of law and
fact.  See Thompson v. Keohane, 516 U.S. 99, 107-12 (1995); Brown
v. Artuz, 283 F.3d 492, 497 (2d Cir. 2002).  Under the AEDPA,
however, a writ of habeas corpus may not issue "with respect to any
claim that was adjudicated on the merits in State court proceedings
unless the adjudication . . . resulted in a decision that was
contrary to, or involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme Court of the
United States."  28 U.S.C. § 2254(d)(1).

    The AEDPA standard applies to this case since Mr. Cox filed
his petition after the Act's effective date.  See Brown, 283 F.3d
at 498 n.2.  However, where, as here, the petitioner's claims fail
under the less deferential pre-AEDPA standard, there is no need to
conduct the AEDPA's more intricate analysis.  Cf. Kruelski v.
Connecticut Superior Court for the Judicial District of Danbury,
316 F.3d 103, 106 (2d Cir. 2003) (suggesting, in post-AEDPA cases,
that habeas courts should assess first whether state court's ruling
was erroneous under the "correct interpretation" of federal law at
issue, then whether the ruling was unreasonable).

[7] Mr. Cox also alleges that the prosecution violated his Rosario
rights.  However, the Rosario rule is grounded in state law and its
violation does not amount to deprivation of a constitutional right.
See Shaut v. Bennet, 289 F. Supp. 2d 354, 363 (W.D.N.Y. 2003);
Copes v. Schriver, No. 97 Civ. 2284, 1997 WL 659096, at *4
(S.D.N.Y. Oct. 22, 1997); Boyd v. Hawk, No. 94 Civ. 7121, 1996 WL
406680, at *6 (S.D.N.Y. May 31, 1996).  Habeas corpus is only
available to redress claims that rise to the level of a federal
constitutional violation.  See Estelle v. McGuire, 502 U.S. 62, 67-

claims that the prosecution failed to disclose (1) un-redacted versions of certain Complaint Follow-Up Reports ("DD5s"); (2) a Detective Bureau Unusual Occurrence Report, a complaint dispatch sheet, property clerk invoices, and a request for laboratory examination; and that it failed to inform the defense about (3) Dorrett Clarke's meeting with A.D.A. Karen, (4) Makeda Clarke's criminal record at the time of the second trial, (5) Ervin Edwards' criminal record, and (6) the presence of additional witnesses who were in the apartment with Makeda Clarke at the time of the incident.

The Second Circuit has summarized the prosecution's duty under Brady as follows: "to the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation grounded in the 14th Amendment to disclose that evidence to the defendant." DiSimone v. Phillips, 461 F.3d 181, 192 (2d Cir. 2006) (alterations omitted) (quoting Leka v. Portuondo, 257 F.3d 89, 98 (2d Cir. 2001)). Thus, there are three components to a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v.

---

68 (1991); Lewis v. Jeffers, 497 U.S. 764, 780 (1990). Thus, Mr. Cox's Rosario claims are considered only to the extent that they may constitute Brady violations.

Greene, 527 U.S. 263, 281-82 (1999). Favorable evidence is only material where there is a "reasonable probability" that the outcome of the case would have been different had the evidence been disclosed. United States v. Bagley, 473 U.S. 667, 682 (1985). A "reasonable probability" in this context arises "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at 678). The question that a habeas corpus court must consider, then, is whether, without the evidence, the petitioner still received a fair trial. See id. For example, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)). However, evidence is not considered "suppressed" if the defendant "either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." Leka, 257 F.3d at 100 (quoting United States v. Leroy, 687 F.2d 610, 618 (2d Cir. 1982)); see also United States v. Torres, 129 F.3d 710, 717 (2d Cir. 1997).

### 1.  Un-redacted DD5s

Mr. Cox does not contest that the prosecution provided the defense with copies of DD5s created by the police during the investigation that led to his arrest. The discovery receipt

provided by the respondent acknowledges delivery of DD5s #1 to #19 to the petitioner's trial attorney.  (Discovery Receipt dated June 17, 1993 ("6/17/93 Discovery Receipt"), attached as Exh. 37 to Blira-Koessler Aff.).  Rather, Mr. Cox argues that the prosecution withheld information critical to the defense at trial by disclosing only redacted copies of these documents.[8]

The petitioner's claim is unavailing.  The prosecution did redact the identities, addresses, and gender of witnesses listed on the DD5s, but defense counsel was otherwise able to read the witness statements and determine whether they contained exculpatory material.  A.D.A. Karen has stated

> [i]t is my practice to turn over complete police reports with only victim or witness information redacted . . . . It is also my practice to disclose to the defense the names and other identifying information of individuals who were interviewed by the police, but who I do not intend to call at trial.

(Affirmation of Allen P.W. Karen dated Oct. 12, 2005 ("Karen 10/12/05 Aff."), attached as Exh. 38 to Blira-Koessler Aff.).  The petitioner has not refuted this representation nor presented evidence that there was a failure to disclose material information contained in the DD5s.

Even if the prosecution had purposefully redacted the DD5s so

---

[8] The petitioner also argues that trial counsel scribbled on the receipt "some copies [are] not legible - bad copy," thus indicating that the prosecution voluntarily withheld information.  However, there is no evidence that the alleged bad quality of certain copies actually hindered defense counsel's efforts to build his case or that he sought to obtain better copies and was rebuffed.

as to withhold information from the defense, no redacted portion contains information of an exculpatory nature.  For example, the petitioner claims that a non-redacted version of DD5 #7 would have allowed the defense to argue that some of the ballistic evidence recovered at the scene came from a shooting at the same location the night before, thereby undermining the prosecution's hypothesis that all three men who confronted Mr. Edwards carried guns.  In its redacted form, DD5 #7 reads:

> Stated that [redacted] was [redacted] heard [redacted] saw the victim lying in the courtyard [redacted] stated that [redacted] & [redacted] Heard lots of shoot last night (Monday) which were comming from Sheridan & McClean St.

(DD5 #7, attached as Exh. 21C to Second Motion to Vacate). Notwithstanding the redactions, the reader can grasp the relevant point that a shooting occurred in the same area the night before Mr. Edwards' death.  Furthermore, the information is redundant.  At trial, the prosecution's ballistics expert testified that up to six different guns could have produced the ballistic evidence that was recovered.  (Tr. vol. 2 at 59-61).

    As to DD5s #13 and #16, both describe witnesses viewing photo arrays of potential suspects.   DD5 #13 describes a witness identifying Mr. Cox, Mr. Hardy, and a third individual, Sean Edwards, as participants in the crime, but Mr. Edwards' name is redacted.  (DD5 #13, attached as Exh. 21A to Second Motion to Vacate).  In DD5 #16, another witness identifies Mr. Hardy and Mr.

17

Edwards as shooters, but again, Mr. Edwards' name is redacted. (DD5 #16, attached as Exh. 21B to Second Motion to Vacate). The petitioner argues that the identification of Sean Edwards as a possible suspect was exculpatory information that should have been disclosed. However, the relevant information here is that two witnesses identified a third man at the scene, and this can be gleaned from the DD5s without disclosing that it was in fact Sean Edwards. Finally, the redacted information is not exculpatory; it does not cast doubt on the petitioner's presence at the scene. Thus, even assuming the prosecution purposefully withheld Sean Edwards' name, the petitioner's <u>Brady</u> claim must fail.

### 2.   Miscellaneous Documents

The petitioner's argument regarding the Detective Bureau Unusual Occurrence Report, Complaint Dispatch Sheet, Property Clerk Invoices, and Request for Laboratory Examination focuses on the fact that those documents do not mention his name.[9] Mr. Cox posits that if Mr. Edwards had indeed identified him to Officer Carson, his name should have appeared on each of these documents, given the importance of the information to the investigation. According to

---

[9] Instead, the Detective Bureau Unusual Occurrence Report and the Complaint Dispatch Sheet both refer to "two or three M/B's" (Detective Bureau Unusual Occurrence Report, attached as Exh. 32 to Blira-Koessler Aff.; Complaint Dispatch Sheet, attached as Exh. 10B to Second Motion to Vacate). The Property Clerk Invoices and the Request for Laboratory Examination list suspects as "Unknown" (Property Clerk Invoices and Request for Laboratory Examination, attached as Exh. 10C and D, respectively, to Second Motion to Vacate).

the petitioner, this constitutes evidence that Mr. Edwards never actually identified him as the shooter, and thus the prosecution should have made these documents available so that the defense could use them to challenge Officer Carson's testimony at trial.

These claims fail because the documents do not disclose any information that was not already in the possession of the defense. There is no Brady violation if the defendant was aware of facts permitting him to take advantage of exculpatory evidence. Leka, 257 F.3d at 100. In this case, defense counsel was aware that the police had omitted the petitioner's name from several documents during the investigation. During discovery, the prosecution gave defense counsel a copy of the Unusual Occurrence Report[10] completed on the day of the shooting. (Discovery Receipt dated Aug. 13, 1993 ("8/13/93 Discovery Receipt"), attached as Exh. 37 to Blira-Koessler Aff.). This report does not name Mr. Cox, and only identifies the perpetrators as "three unidentified male Blacks." (Unusual Occurrence Report, attached as Exh. 10A to Second Motion to Vacate). The prosecution also provided defense counsel with the Sprint Report[11] from the day of the incident, which likewise states only that the police were "looking for 3 ML BLKK" and does not give the petitioner's name. (Sprint Report, attached as Exh. 16 to

---

[10] The Unusual Occurrence Report and the Detective Bureau Unusual Occurrence Report are two different documents.

[11] A "Sprint Report" is a police document containing a synopsis of a 911 call.

Second Motion to Vacate).  These materials were sufficient for the defense to glean that the police were referring in some reports to "unidentified male blacks" instead of naming Mr. Cox.  The petitioner cannot claim that deprivation of redundant information was prejudicial to his case.

Furthermore, the police forms are neither exculpatory nor impeaching.  Besides Officer Carson, three other witnesses placed Mr. Cox at the scene of the shooting: Darren Dingle, Aaron Fields and Makeda Clarke.  Additionally, at the hearing on the petitioner's First Motion to Vacate, Sergeant John Pegram explained that identification of a suspect is usually not required on the Unusual Occurrence Report because "this information [] gets released to the press and we wouldn't want that person to know we were looking for them."  (H3 at 161-62).  This is a plausible explanation.  The petitioner has not established a reasonable probability that the outcome of the case would have been different had the documents been disclosed.

### 3.   Dorrett Clarke Testimony

The petitioner claims that the prosecution further violated his Brady rights by withholding information about an alleged meeting between A.D.A. Karen and Dorrett Clarke, during which Ms. Clarke volunteered potentially exculpatory information about whether her daughter Makeda actually witnessed the shooting of Ervin Edwards.

20

In an affidavit, Dorrett Clarke stated that on the day of the shooting, she was in her fifth floor apartment with her two daughters when she heard Mr. Edwards arguing with someone in the courtyard.  (Affidavit of Dorrett Clarke dated November 5, 1998 ("Clarke 11/5/98 Aff."), attached as Exh. C to First Motion to Vacate).  As she approached the window, she heard a gun shot, "grabbed her daughters," and "ran to the bedroom, to get out of harms way." (Clarke 11/5/98 Aff.).  Ms. Clarke also stated that she conveyed this to A.D.A. Karen, indicating to him that Makeda "could not have witnessed the shooting, because she was in the bedroom." (Clarke 11/5/98 Aff.).  In an affidavit in response, A.D.A. Karen denied ever meeting with Dorrett Clarke.  (Affidavit of Allen P.W. Karen dated Sept. 15, 2000 ("Karen 9/15/00 Aff."), attached as Exh. 1 to Affirmation in Opposition of Peter D. Coddington dated Sept. 15, 2000, attached as Exh. 4 to Blira-Koessler Aff., ¶ 4).

At the hearing on the first motion to vacate, Ms. Clarke testified that on the day Mr. Edwards was killed, she told Detective Martinez that they could not see what took place and that Mr. Edwards had shot at her apartment from the courtyard the night before.  (H3 at 21).  Detective Martinez denied that Ms. Clarke ever told him these things.  (H3 at 182-83).  Ms. Clarke also testified that she met with A.D.A. Karen in his office in 1996 after Makeda "came in a panic," afraid that they were going to

"lock her up" if she didn't testify.  (H3 at 22).  Ms. Clarke stated that she explained to A.D.A. Karen that Makeda could not have seen Mr. Edwards's killing.  (H3 at 22-24).  When A.D.A. Karen testified at the hearing, he acknowledged that the trial transcript quoted him as saying Makeda came in his office on September 18, 1996 with her mother and sister.  (H3 at 119, 20; Tr. vol. 2 at 192).[12]  However, he denied ever seeing "the woman who testified here," Dorrett Clarke.  (H3 at 120).

In denying the petitioner's first motion to vacate, the trial court found that Ms. Clarke was a "confused and incredible" witness.  "Her testimony simply did not possess the ring of truth." (First § 440.10 Decision at 3).  The court further held that there was "no credible evidence that Ms. Clarke ever spoke with [A.D.A.] Karen or that [she] ever informed Detective Martinez of her allegations contained in either her affidavit or in her hearing testimony."  (First § 440.10 Decision at 5).

A state court's holding on a factual issue is entitled to a presumption of correctness.

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

---

[12] The transcript was from September 19, 1996, so the meeting would have occurred on September 18, 1996.  (H3 at 120).

28 U.S.C. § 2254(e)(1); see also Morris v. Reynolds, 264 F.3d 38, 47 (2d Cir. 2001); Leslie v. Artuz, 230 F.3d 25, 31 (2d Cir. 2000). A petitioner can overcome the state court's factual determination only if it is not fairly supported by the record or not adequately developed at the state court hearing. Morris, 264 F.3d at 47. The issue before the state court was not the veracity of Ms. Clarke's testimony about the day of the shooting, but whether Ms. Clarke had met with A.D.A. Karen and relayed exculpatory information to him that he was obligated to disclose under Brady. Ms. Clarke's testimony concerning the alleged meeting was extremely fuzzy, as she was unable to recollect the date, month, or even the season of the alleged encounter. (H3 at 22, 50-55). She denied knowing whether Makeda ever testified, then later conceded that Makeda told her about it a year after the trial. (H3 at 40-48, 48-50). Given the confusion in Ms. Clarke's testimony, weighed against the testimony of A.D.A. Karen and Detective Martinez, the hearing court's decision was well-founded.[13]

### 4. Makeda Clarke's Criminal Record

Next, the petitioner argues that the prosecution failed to

---

[13] Ms. Clarke supplied another affidavit in support of the petitioner's second motion to vacate. (Affidavit of Dorrett Clarke dated July 17, 2005, attached as Exh. 24B to Second Motion to Vacate). While more clear than her first affidavit, it does not provide any new evidence to prove she met with A.D.A. Karen. The same is true of Makeda Clarke's affidavit, dated July 17, 2005, echoing largely what was stated by her mother. (Affidavit of Makeda Clarke dated July 17, 2005 ("Makeda 7/17/05 Aff."), attached as Exh. 23 to Second Motion to Vacate).

inform defense counsel that, at the time of her testimony in Mr. Cox's second trial, Makeda Clarke had a criminal record.  Makeda had a misdemeanor conviction for Theft of Services under the alias "Daine Ried" and was facing charges of Petit Larceny and Criminal Possession of Stolen Property at the time of the petitioner's second trial.  (Respondent's Appendix, attached as Exh. 12 to Blira-Koessler Aff., at 3-6).  The petitioner submits that the fact that Makeda faced charges at the time of the trial would have been exculpatory, as it showed her motive for testifying as a witness for the prosecution.[14]  Defense counsel confirmed at the hearing on the first motion to vacate that the prosecution never advised him of her prior record or her arrest.  (H3 at 74-76).

The petitioner's <u>Brady</u> claim regarding Makeda's criminal record must fail.[15]  In denying the petitioner's first motion to

---

[14] In addition to failing to disclose her criminal record, the petitioner alleges that the prosecution failed to disclose a promise of leniency to Makeda Clarke.  This claim fails for the same reasons discussed below.

[15]    In a letter submitted after briefing had closed, the respondent argues that Mr. Cox asserted a <u>Brady</u> claim only with respect to Ms. Clark's prior conviction in state proceedings, and not with respect to the charges pending at the time of trial. (Respondent's Letter dated Feb. 15, 2007).  Exhaustion requires that the factual and legal basis for each claim be fairly presented to the highest available state court.  <u>Daye v. Attorney General of the State of New York</u>, 696 F.2d 186, 191 (2d Cir. 1982) (en banc) (citations omitted).  Mr. Cox argued on appeal that the prosecution "fail[ed] to provide defense counsel with Makeda Clarke's criminal record" (Brief of Defendant-Appellant ("Pet. Appellate Brief"), attached as Exh. 10 to Blira-Koessler Aff., at 4), but did not refer explicitly to the "pending" charges because his Freedom of Information Law request had only yielded the prior conviction.  The

vacate, the trial court determined that "[A.D.A.] Karen was unaware of [] Makeda Clark's earlier conviction which had been recorded under another name." (First § 440.10 Decision at 6). As to whether the prosecution re-checked Makeda's criminal record between the first and second trials, A.D.A. Karen eventually acknowledged that a second check was run. (H3 at 206). The record would have revealed both the conviction for Theft of Services and the then-pending charges for Petit Larceny and Criminal Possession of Stolen Property. However, A.D.A. Karen testified that he "[did not] recall this rapsheet at the time or even running it". (H3 at 206).

There may well be some doubt whether the prosecution met its obligations under <u>Brady</u>. However, the petitioner cannot prevail because he has not demonstrated a reasonable possibility that the outcome of the case would have been different had the information been disclosed. See <u>Bagley</u>, 473 U.S. at 682. Furthermore, information affecting credibility is material to a <u>Brady</u> claim only where the "reliability of a given witness may well be determinative of guilt or innocence". <u>Napue</u>, 360 U.S. at 269. In this case, as

_____

respondent, however, did discuss them and attached the criminal history that was run between the first and second trials to its brief. (Respondent's Brief ("Resp. Appellate Brief") at 11; Respondent's Appendix at 3-6). The petitioner later referenced them in his second motion to vacate. (Second Motion to Vacate at 57). Because the state court had the factual and legal basis to decide the claim, this Court may consider it on the merits. In any event, even where a petitioner fails to exhaust all of his claims in state court, a federal court has the discretion to dismiss a petition on the merits. 28 U.S.C. § 2254(b)(2).

the state court noted it its decision, "[g]iven the vigorous, intensive and in many respects devastating cross-examination of the witness, the additional information that this young witness had a prior conviction would not have resulted in prejudice . . . ." (First § 440.10 Decision at 5).  Her lack of credibility was already taken into account by the jury, thus, there is not a reasonable possibility that further impeachment would have changed the verdict.

5.   <u>Ervin Edwards' Criminal Record</u>

The petitioner incorporates a claim made in his second motion to vacate that the prosecution violated <u>Brady</u> by failing to turn over the criminal record of the victim.  (Grounds, Attach. E to Petition for Habeas Corpus ("Grounds for Petition") at 3).  That record indicates that Mr. Edwards allegedly assaulted a man with a baseball bat and a garbage can in 1991.  (Arrest Report of Ervin Edwards, attached as Exh. 11 to Second Motion to Vacate). According to the petitioner, this was exculpatory material because it suggested that someone else had a motive to kill the victim. However, the assertion is speculative and cannot, without more, support a <u>Brady</u> claim.

6.   <u>Other Persons in the Apartment</u>

Finally, the petitioner claims that the prosecution withheld information about other potential witnesses who were with Makeda Clarke at the time of the shooting, namely Makeda's mother and

26

sister, Dorrett and Natasha Clarke, and Dorrett Clarke's friend, Dwight Furret.   Mr. Cox argues that these persons could have contributed exculpatory information at trial and that failing to disclose their presence violated <u>Brady</u>.

During the hearing on the petitioner's first motion to vacate, A.D.A. Karen testified that he was not aware that Makeda's sister Natasha may have been with her at the time of the incident.

> Q: What about her daughters? [Dorett] Clarke testified that she came to Mr. Karen and mentioned that she had Makeda and I believe she mentioned she had a daughter named Natasha who was present during the shooting?
>
> A.D.A. Karen: If we were aware of another witness, the daughter Natasha, we certainly would have interviewed her as a possible witness.
>
> Q: Is there any notation in your file relating to any interviews of either of these wom[e]n?
>
> A.D.A. Karen: No.  In fact, the name Dorrett Clarke does not appear anywhere in the DA's file which consists of six large folders.

(H3 at 129-30).  However, Detective Martinez testified that Makeda Clarke "had other family . . . members present with her" on the day of the incident, and that one of these persons was Dwight Furret. (H3 at 186, 194).  The respondent now concedes that Natasha Clark, Dwight Furret, and Dorett Clark's names did in fact all appear in the prosecution's files, namely on DD5s #4 and #5.  (Respondent's Memorandum of Law ("Resp. Memo.") at 69-70).

The petitioner maintains that, had the defense known that there were other people in the apartment with Makeda, it could have

interviewed them and extracted potentially exculpatory information. (Reply to Respondent's Opposition to Petitioner's Writ of Habeas Corpus Petition ("Pet. Reply") at 11).   As an example, the petitioner points to DD5 #5, in which Dwight Furret is credited with the following statement:

> Witness states that [redacted] opened the kitchen window and seen a male Black wearing a Camo jacket, holding another male up against the wall by his jacket and heard a distubance going on between them.   There was another male hispanic wearing a red sweatshirt and a black jacket holding a gun in his right hand.   The first male black that was holding the other guy let go, and the guy that was being held slumped to the ground.   The male hispanic then approached to the guy on the ground and pointed the gun at him and said something "Mother Fucker" and fired two(2) more shots at him.   Both the guy ran toward 167 St.

(DD5 #5, attached as Exh. 9 to Second Motion to Vacate).   The petitioner also alleges that Detective Martinez "did not produce, or simply withheld the police reports," of interviews conducted with Dorrett and Makeda Clarke.   (Petitioner's Memorandum of Law for a Writ of Habeas Corpus ("Pet. Memo.") at 45).

Even if the prosecution actually failed to disclose Dorrett Clarke's identity and the fact that she was with Makeda at the time of the incident, the defense was independently aware that she was a potential witness.   As Mr. Heinrich testified during the hearing on Mr. Cox's first motion to vacate, he personally interviewed Dorrett Clarke, and she told him that she was in the apartment with Makeda at the time of the shooting.   (H3 at 82).

The petitioner's claims concerning the prosecution's failure

to disclose the presence of Natasha Clarke and Dwight Furret also fail. Mr. Furret and Ms. Clarke's statements were both collected on DD5 #5, which was turned over to the defense. (6/17/93 Discovery Receipt). The statements were only redacted to conceal their names and gender, such that any relevant exculpatory information could be readily gleaned by the reader. And, as previously noted, A.D.A. Karen stated that it was his practice to disclose the names and identifying information of persons interviewed by the police whom he did not intend to call at trial. (Karen 10/12/05 Aff.). There is no indication that A.D.A. Karen refused to reveal the names of these witnesses, and the petitioner has not provided any affidavit by trial counsel to that effect.

Contrary to the petitioner's arguments, the interviews of Ms. Clarke and Mr. Furret contained in DD5 #5 are also not exculpatory. Ms. Clarke stated that she saw three men chasing after another one and shooting once at him. (DD5 #5, attached as Exh. 9 to Second Motion to Vacate). Rather than weakening the prosecution's case, Ms. Clarke's statement would seem to strengthen it with respect to the attempted murder charge. Likewise, Mr. Furret's statement does not remove the petitioner from the scene of the crime. Besides the Hispanic man shooting Mr. Edwards, Mr. Furret's statement also refers to a Black man looking on and running away with the shooter.

(DD5 #5).[16]   In conjunction with Darren Dingle's testimony, Mr. Furret's statement adds to the evidence against Mr. Cox.

Even though neither Natasha Clarke or Dwight Furret's statements are exculpatory on their own, the petitioner argues that they could have helped challenge Makeda Clarke's testimony at trial.   However, as discussed above, Makeda's credibility was seriously damaged during her cross-examination at trial and it is unlikely that Natasha Clarke or Dwight Furret could have weakened it further in the jury's eyes.   The petitioner's Brady claims should therefore be denied.

    B.   Perjury Claims

The petitioner alleges that the prosecution violated his due process rights by knowingly relying on perjured testimony. Specifically, Mr. Cox claims that perjury occurred when (1) Detective Martinez stated that the third suspect at the scene had not been identified, (2) Officer Carson and Detective Martinez testified about Ervin Edwards' incriminating statements, and (3) Makeda Clarke testified about witnessing the shooting of Ervin Edwards.

---

[16] To obtain a conviction of first degree manslaughter acting in concert, the prosecution did not have to prove that Mr. Cox actually shot Mr. Edwards.   It was sufficient to show that he intended to cause Mr. Edwards serious harm, and that this resulted in Mr. Edwards's death.   See, e.g., People v. Martinez, 30 A.D.3d 353, 817 N.Y.S.2d 288 (1st Dep't 2006) (upholding conviction of first degree manslaughter where defendant did not inflict fatal injury).

To successfully challenge a conviction because of a prosecutor's use of false testimony, a petitioner must demonstrate that (1) "the prosecution knew, or should have known, of the perjury," and that (2) "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)). When a prosecutor is unaware of a trial witness' false testimony, due process is violated where "the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" Ortega v. Duncan, 333 F.3d 102, 108 (2d Cir. 2003).

   1.   Detective Martinez

_____The petitioner contends that the prosecution knowingly used false testimony when it allowed Detective Martinez to state at trial that there was another suspect in the case but that this suspect was never identified. (Grounds for Petition at 3). Mr. Cox points to DD5s #13 and #16 as evidence that the suspect was identified by witnesses as Sean Edwards. (Second Motion to Vacate at 45). However, it is plausible that what Detective Martinez intended to convey during his testimony was that the police never followed up on the third suspect. Thus, the petitioner has not shown that Detective Martinez knowingly misled anyone about Sean Edwards. More importantly, the petitioner has simply failed to

31

show that identification of Sean Edwards as the third suspect, rather than simply knowing there was a third suspect, was reasonably likely to affect the jury's verdict.

### 2. Officer Carson and Detective Martinez

The petitioner points to alleged discrepancies between the testimony of Officer Carson, Detective Martinez, and certain DD5s as evidence of perjury regarding Mr. Edwards' statement at the crime scene that Rico Cox shot him.  (Grounds for Petition at 3). First, he notes that Officer Carson testified at trial that Mr. Edwards made the statement to him before the ambulance arrived (Tr. vol. 2 at 130), while DD5 #2 suggests Officer Carson had reported receiving this information while emergency personnel were treating the victim.  Second, the petitioner notes that Officer Martinez testified that he responded to the crime scene and spoke with Officer Carson (Tr. vol. 2 at 69), who relayed the conversation he had with Mr. Edwards.  (Tr. vol. 2 at 135).  The petitioner argues that this would have been impossible because DD5 #3 indicates that Detective Martinez responded to Lincoln Hospital and it was there that he was advised about Rico Cox.

Contrary to the petitioner's contention, neither DD5 #2 nor #3 states with specificity when the information was relayed. DD5 #2 records Officer Carson as saying the ambulance arrived "and statrted [sic] to treat the victim, who stated to me that he had been shot by Rico Cox . . . ."  (DD5 #2, attached as Exh. 13 to

32

Second Motion to Vacate).  This could be read to mean that it was the victim, Mr. Edwards, who made the statement to him, without necessarily meaning the statement was made as Mr. Edwards was being treated.  DD5 #3 states that Detective Martinez "was also advised that the aided Ervin [Edwards] was shot by a male known as 'Rico Cox,'" without stating who advised him or when.  (DD5 #3, attached as Exh. 12 to Second Motion to Vacate).

More importantly, the petitioner has not shown that the these inconsistencies were purposeful rather than inadvertent, or that the evidence, if presented differently, would have changed the jury's verdict.  It would still have implicated the petitioner in the crime.

     3.  <u>Makeda Clarke</u>

The petitioner claims that the prosecution's use of Makeda Clarke's testimony amounted to a due process violation because she could not have witnessed the shooting of Ervin Edwards.  (Grounds for Petition at 3).  The petitioner further claims that the testimony itself was procured by coercion.[17]  In support of this

---

[17] The petitioner makes a related claim that the court improperly denied his motion to reopen the hearing on his first motion to vacate after he had obtained the affidavit of Makeda Clarke.  This does not raise a question of federal constitutional law.

Additionally, the petitioner restates an argument made on appeal that the trial court improperly questioned Makeda Clarke on the stand when the judge stated, "Did you see Rico Cox--listen to me, young lady -- did you see Rico Cox with a gun?  Yes or no." (Tr. vol. 2 at 234).  This claim cannot be considered on the merits because it was procedurally defaulted and therefore denied on an

assertion, the petitioner points to a 2005 affidavit by Makeda Clarke in which she describes being threatened with jail by the prosecution, both before the trial and during her testimony when A.D.A. Karen interrupted her direct examination to speak with her privately. (Second Motion to Vacate at 26-27, 49-50; Makeda 7/17/05 Aff.). The petitioner also points to the abrupt change in her testimony after A.D.A. Karen conferred with her as evidence of coercion. (Second Motion to Vacate at 51).

The Appellate Division had the opportunity to consider the petitioner's claims of coercion of Makeda. Mr. Cox initially raised them in his application to reopen his motion to vacate, and he advanced them again in his appeal. The Appellate Division also had before it the earlier, handwritten version of Makeda's affidavit, identical in all material respects to the 2005 affidavit. (Makeda 11/27/00 Aff.). Ultimately, the court found that the statements made in Makeda's affidavit "would not . . . have affected the result of the hearing." Cox, 297 A.D.2d at 589, 747 N.Y.S.2d at 178. This conclusion of fact is entitled to a presumption of correctness.

Furthermore, defense counsel testified at the hearing on the petitioner's first motion to vacate that he "did not believe Makeda

independent and adequate state ground. Cox, 297 A.D.2d at 589, 747 N.Y.S.2d at 179. ("Defendant's claim that he was denied a fair trial because of the court's questioning of a witness is unpreserved for appellate review and we decline to review it in the interest of justice.") (citation omitted).

could have seen what she said she saw at all," and this is what he
set out to prove at trial.  (H3 at 83-86).  He challenged aspects
of her testimony and pointed out multiple discrepancies between it
and her earlier statements before two separate grand juries and at
the petitioner's first trial.  (Tr. vol. 2 at 218-21, 224-28).  At
the end of his cross-examination of Makeda, she conceded that she
did not see what happened.  (Tr. vol. 2 at 232).  Then on re-
direct, she said that she did.  (Tr. vol. 2 at 233).  Because the
jury heard her story change repeatedly, it is not likely that it
placed substantial reliance on her testimony.  Therefore, even if
the prosecution acted improperly, the petitioner cannot show that
this affected the verdict.

   C.   Ineffective Assistance of Trial Counsel

     The   petitioner   next   claims   that   his   trial   counsel's
performance   was   deficient   in   various   respects   and   that   this
violated  his  Sixth  Amendment  right  to  effective  representation.
Specifically,  Mr. Cox  argues  that  counsel  failed  to  (1)  impeach
Officer  Carson,  (2)  interview  EMT  workers  who  treated  Mr. Edwards,
(3)  impeach  Detective  Martinez,  (4)  obtain  unredacted  copies  of  DD5
#7,  #13,  and  #16,  and  (5)  challenge  the  effectiveness  of  the  police
investigation.

     A  habeas  petitioner's  claim  that  he  received  ineffective
assistance  of  counsel  is  analyzed  according  to  the  principles  set
forth  in  Strickland v. Washington,  466 U.S. 668 (1984).  Under this

35

test, a petitioner must demonstrate (1) that the representation he received "fell below an objective standard of reasonableness," id. at 688, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. When reviewing counsel's performance, a habeas court should be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. The habeas court should not "second-guess trial counsel's defense strategy simply because the chosen strategy has failed." United States v. DiTommaso, 817 F.2d 201, 216 (2d Cir. 1987).

### 1.   Failure to Impeach Officer Carson

The petitioner claims that his trial counsel's failure to impeach Officer Carson using the Unusual Occurrence Report, complaint dispatch sheet, Sprint Report, and DD5 #2 amounted to ineffective assistance of counsel. Specifically, he argues, if counsel had not overlooked the Unusual Occurrence Report, he could have used it to contradict Officer Carson's testimony that Mr. Edwards told him "Rico Cox shot me". (Tr. vol. 2 at 133-34). This is because the Unusual Occurrence report does not identify the petitioner by name or address. (Unusual Occurrence Report, attached as Exh. 10A to Second Motion to Vacate). The petitioner makes the same argument about the complaint dispatch sheet and Sprint Report, which likewise do not mention the petitioner's name

or address.  Finally, the petitioner claims that counsel should have used DD5 #2 to impeach Officer Carson with respect to the timing of Mr. Edwards' statement.

a.   Unusual Occurrence Report

At the hearing on the petitioner's first motion to vacate, trial counsel stated that he had never seen the Unusual Occurrence Report (H3 at 79-80), but he acknowledged that he would have used it to cross-examine the prosecution's witnesses.  (H3 at 80-81). Later, the respondent produced a discovery receipt, signed by Mr. Heinrich, showing that he in fact had received a copy of this report.  (8/13/93 Discovery Receipt).  The petitioner argues that his trial counsel's failure to use the report to impeach Officer Carson was evidence of ineffective assistance.

The petitioner attaches great weight to the fact that trial counsel claimed he had not received the Unusual Occurrence Report, when in fact he had a copy in his possession.  He insists that this failure was not borne of strategy, but of poor preparation. However, this does not by itself establish that counsel's representation fell below the standard of objective reasonableness in Strickland.  The defendant here has not met his burden to show trial counsel had no tactical reason not to use the documents. Indeed, pointing to counsel's testimony from the hearing on the first motion to vacate (H3 at 106), the respondent suggests that there is a plausible explanation for his failure to challenge

Officer Carson -- that he did not want to risk having Officer Carson repeat "Rico Cox shot me" multiple times in the presence of the jury. (Resp. Memo. at 77-78). Counsel's testimony that he would have used the report at trial can be interpreted as an attempt to support the petitioner's Brady claims. See People v. Alicea, 229 A.D.2d 80, 88, 656 N.Y.S.2d 2, 6 (1st Dep't 1997) (rejecting ineffective assistance claim where trial counsel was in fact in possession of documents that, counsel had claimed, he would have used at trial had the prosecution turned them over).

Whatever trial counsel's strategy may have been, the petitioner is also unable to show that the outcome of Mr. Cox's second trial would have been different if counsel had used the Unusual Occurrence Report. Three other witnesses placed the petitioner at the scene of the crime: Darren Dingle and Aaron "Bucky" Fields, whose testimony the petitioner has not challenged, and Makeda Clarke.

    b. Complaint Dispatch Sheet and Sprint Report

The petitioner's claim with respect to the complaint dispatch sheet and Sprint Report is likewise unavailing. (Exhs. 10B and 16 to Second Motion to Vacate). As discussed above, the fact that the complaint dispatch sheet did not mention the petitioner's name or address is neither impeaching nor exculpatory. The prosecution would have been able to present a plausible explanation for their absence from investigation forms potentially accessible to the

public.   Officer  Carson  also  presented  an  explanation  for  the
absence  of  Mr.  Cox's  name  from  the  Sprint  Report.   He  testified
that  he  did  not  broadcast  Mr.  Cox's  name  on  the  radio  because
"right  after  I  put  over  the  description  of  three  male  blacks
leaving  the  scene,  a  10-13[18]  came  over  the  air."   (H3  at  149-50).
By  the  time  the  10-13  was  over,  Detective  Martinez  had  arrived,  so
Officer  Carson  felt  it  was  sufficient  to  relay  the  information  to
him.   (H3  at  154).   Furthermore,  the  other  witnesses  corroborate
the  fact  that  the  petitioner  was  at  the  scene.   Therefore,  Mr.  Cox
is  unable  to  prove  prejudice.

c.   <u>DD5 #2</u>

Finally,  Mr.  Cox's  ineffective  assistance  claim  with  respect
to  DD5  #2  fails.   As  discussed  above  with  regard  to  the
petitioner's  perjury  claim,  DD5  #2  is  not  inconsistent  with  Officer
Carson's  testimony  that  Mr.  Edwards  identified  Rico  Cox  as  the
shooter  before  the  ambulance  arrived.   Moreover,  it  is  not  likely
that  a  jury  would  have  interpreted  any  discrepancy  in  timing  as  a
suggestion  of  perjury  or  as  proof  that  Mr.  Edwards  did  not  identify
Mr.  Cox.

2.   <u>Failure to Interview EMT Personnel</u>

The  petitioner  contends  that  his  trial  counsel's  performance
was  deficient  because  he  did  not  track  the  identities  of  Emergency

---

[18] A  "10-13"  is  a  radio  call  for  officer  assistance,  during  which
all  non-priority  radio  transmission  must  be  suspended.

Medical Technicians ("EMTs") who treated Mr. Edwards immediately after he was shot.   Mr. Cox argues that interviews with EMT personnel would have yielded evidence to impeach Officer Carson's trial testimony that Mr. Edwards made his incriminating statement before the ambulance reached the scene.   (Second Motion to Vacate at 55).

The petitioner does not offer any evidence that counsel did not attempt to speak to EMT personnel or that they would have provided exculpatory information.   Indeed, if EMT personnel were to contradict Officer Carson's trial testimony by confirming the conversation took place after the ambulance arrived, it would have only served to confirm that Mr. Edwards made the statement.

### 3.   Failure to Impeach Detective Martinez

The petitioner further argues that trial counsel failed to impeach Detective Martinez's corroboration of Officer Carson's testimony using DD5 #3.   Detective Martinez testified at trial that he learned of the petitioner's name and address from speaking to Officer Carson at the scene of the crime.   (Tr. vol. 2 at 130). DD5 #3 seems to place him at Lincoln Hospital and suggests that he learned of the petitioner's name and address there.

As discussed above in connection with the petitioner's perjury claim, DD5 #3 does not actually state who advised Detective Martinez of Mr. Cox's identity or when.   It is possible that further development of the issue would only have clarified how the

information was relayed to him.  In any event, trial counsel may
have wanted to avoid the prejudicial effect of repeating Mr.
Edwards' statement "Rico Cox shot me" multiple times.

        4.    Failure to Obtain Unredacted Copies of
              DD5s #7, #13, and #16

The petitioner next contends that his trial counsel rendered
ineffective assistance because he failed to request and obtain
unredacted copies of police reports that he could have used to
challenge the prosecution's evidence, to interview witnesses who
had exculpatory information, and to argue that there was an another
perpetrator.  Specifically, the petitioner claims, DD5 #7 contains
witness statements about a shooting that took place the night
before Mr. Edwards was killed, which trial counsel could have used
to challenge the prosecution's ballistic evidence.  The petitioner
additionally contends that had the defense obtained unredacted
versions of DD5s #13 and 16, he could have made a case that Sean
Edwards was responsible for Ervin Edwards' death.  The petitioner
faults counsel for failing to follow up with the witnesses whose
names were redacted from DD5s #13 and 16.

As a general matter, these claims fail because the critical
information in the DD5s can still be gleaned from the redacted
versions.  Only the names, addresses, and gender of the witnesses
were redacted.  Second, neither the petitioner's nor Leon Hardy's
names were redacted from DD5s #13 and #16.  The reader could
therefore easily deduce that a person other than Mr. Cox or Mr.

41

Hardy was identified as a shooter.  (H3 at 82).  Finally, trial counsel may not have wanted to draw attention to DD5s #16 and #17 because they confirmed the fact that the petitioner was present. He evidently  made the reasonable strategic decision to emphasize the lack of evidence against his client and the unreliability of trial witnesses.  (Tr. vol. 2 at 285, 292-93, 297, 298, 300, 303-305).   Use of unredacted versions of the DD5s would have done little to change the outcome of the case.  For example, DD5 #7 did describe a shooting the night before.  (DD5 #7, attached as Exh. 21C to Second Motion to Vacate).   However, the prosecution's ballistics expert testified that he could not be sure when the shells retrieved from the scene had actually been fired, and that up to six different guns could have produced the ballistic evidence recovered.   (Tr. vol. 2 at 59-61).   Second, DD5s #13 and #16 describe two witnesses viewing photo arrays and identifying Sean Edwards as a participant in the crime.  (DD5s #13 and 16, attached as Exhs. 21A and 21B, respectively, to Second Motion to Vacate). But because Mr. Cox was tried on an acting-in-concert theory, the identity of the third person was of little relevance to rebutting the charges against him.

>          5.   Failure to Challenge the Effectiveness of
>               the Police Investigation

The petitioner criticizes his trial counsel's failure to challenge the effectiveness of the police investigation, but he does not support this contention or articulate how such a challenge

could have affected the outcome of his case.

    D.   Ineffective Assistance of Appellate Counsel

    Mr. Cox argues that his appellate counsel was ineffective because he failed to develop claims that (1) the second trial violated the petitioner's right to be free from double jeopardy, and (2) the petitioner's rights were violated because he was absent from challenge conferences and sidebar discussions with members of the jury panel during voir dire.   In addition, the petitioner argues that his appellate counsel's performance was deficient because counsel did not request oral argument, because he improperly assembled the appeal papers, and because he failed to request the record from the petitioner's previous CPL § 330.30 motion.

    The two-prong Strickland analysis applies equally to the performance of appellate counsel. Clark v. Stinson, 214 F.3d 315, 321 (2d Cir. 2000).  It is well established that appellate counsel "need not advance every argument, regardless of merit, urged by the appellant." Evitts v. Lucey, 469 U.S. 387, 394 (1985); see also Jones, 463 U.S. at 754 n.7; Jameson v. Coughlin, 22 F.3d 427, 429 (2d Cir. 1994).   However, "a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).   In order to show prejudice in the

appellate context, "a petitioner must demonstrate that 'there was a reasonable probability that [his] claim would have been successful before the [state's highest court].'" Id. at 534 (quoting Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992)) (alteration in original).

        1.   Double Jeopardy Claims

The petitioner contends that his appellate attorney should have challenged his prosecution for second degree attempted murder and first-degree manslaughter at the second trial after he had been acquitted for murder in the first trial.  The petitioner claims that prosecuting him under those circumstances violated the Double Jeopardy Clause of the Fifth Amendment.

The Double Jeopardy Clause contains three guarantees.  "It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711 (1969)(citations omitted), overruled in part on other grounds, Alabama v. Smith, 490 U.S. 794 (1989).

The respondent argues, with respect to the attempted murder count, that the argument was not preserved for appeal because it was not timely interposed at trial.  (Resp. Memo. at 46).  The respondent notes that appellate counsel cannot be deemed ineffective for failing to raise a claim if such a claim would have

been futile.  Aparicio v. Artuz, 269 F.3d 78, 96 (2d Cir. 2001).
New York law does require defendants to preserve arguments by
registering a protest at a time when the trial court has the
opportunity to change the challenged ruling or instruction.  CPL §
470.05(2).   However, arguments that the defendant has been
prosecuted for the same offense after acquittal or conviction
"implicate the jurisdiction and authority of the court and are thus
reviewable by [the appeals court] despite a defendant's failure to
object."  People v. Gonzalez 99 N.Y.2d 76, 82, 751 N.Y.S.2d 830,
832-33 (2002) (citing People v. Michael, 48 N.Y.2d 1, 7, 420
N.Y.S.2d 371, 373-74 (1979) (finding the question of law so
fundamental that failure to preserve did not preclude review)).
Thus, this Court may review appellate counsel's failure to raise a
double jeopardy claim on appeal.

### a.   Second Degree Attempted Murder

Mr. Cox contends that the evidence presented by the
prosecution at the first trial was legally insufficient to sustain
the charge of attempted murder of Darren Dingle.  (Pet. Memo. at
63).  He also maintains that the trial court improperly refused to
dismiss the count after a timely request by defense counsel.  The
petitioner argues that this allowed the prosecution a "second bite
at the [] apple," in violation of the Double Jeopardy Clause.
(Pet. Memo. at 67).

During the first trial, the prosecution presented witness

45

Case 1:06-cv-03159-PAC-JCF   Document 20   Filed 10/10/07   Page 46 of 60

testimony that the petitioner approached the scene of the crime with Leon Hardy and a third man and got into an altercation with Mr. Edwards. (First Tr.[19] at 208, 240). When Mr. Dingle started running away, Mr. Hardy chased him and fired shots in his direction. (First Tr. at 242). Witnesses testified to seeing the petitioner with a gun and running away in the same direction as Mr. Hardy. (First Tr. at 140, 208, 223). At the close of trial, defense counsel made a motion for dismissal of the count pursuant to CPL § 290.10. (First Tr. at 267-68). The trial court initially reserved decision on this count, sending only the second degree murder and first degree manslaughter charges to the jury. (First Tr. at 276). After the verdict came back, however, the court denied counsel's motion and ordered a retrial on the attempted murder and first degree manslaughter counts. (Pet. Memo. at 66).

If the evidence presented in the first trial were indeed insufficient, the petitioner would have been permitted to raise this argument on appeal from the second trial as a double jeopardy claim. See People v. Dann, 100 A.D.2d 909, 474 N.Y.S.2d 566 (2d Dep't 1984) (finding that because the defendant could not seek an appeal prior to conviction, he should not later be "preclude[d] from seeking, on double jeopardy grounds, a review of the sufficiency of evidence presented at the first trial") (quoting People v. Tingue, 91 A.D.2d 166, 167, 458 N.Y.S.2d 429, 430 (4th

---

[19] "First Tr." refers to the transcript of the first trial.

Dep't 1983)); see also Burks v. United States, 437 U.S. 1, 10-11
(1978) ("[T]he petitioner could not be retried for the same offense
. . . . it should make no difference that the reviewing court,
rather than the trial court, determined the evidence to be
insufficient.").

However, as with any ineffective assistance claim, the
petitioner is also required to show prejudice.  In this case, the
petitioner did challenge the sufficiency of the prosecution's
evidence in the second trial on appeal.  (Pet. Appellate Brief at
5-7).  The evidence presented in the second trial with respect to
the attempted murder of Darren Dingle was, in all material
respects, identical to the evidence presented in the first.[20]  The
appellate court found that "the verdict was based on legally
sufficient evidence" and that "the credible evidence clearly
warranted an inference of accessorial conduct." Cox, 297 A.D.2d at
589, 747 N.Y.S.2d at 179.  Because the petitioner cannot
demonstrate a reasonable probability that the claim would have been
successful, his ineffective assistance claim must be denied.

b.  First Degree Manslaughter

Next, the petitioner contends that, since he was acquitted of

---

[20] The prosecution's case in the second trial differed in that
Jacquita Tucker did not testify and Makeda Clarke's testimony was
less definite.  However, these differences only support the
proposition that the appellate court is unlikely to have determined
that the evidence was legally insufficient in the first trial if it
deemed the evidence in the second to be sufficient.

the charge of second degree murder at his first trial, his retrial on the lesser offense of first degree manslaughter of Erwin Edwards violated the Double Jeopardy Clause.  (Pet. Memo. at 71-74).  He notes that second degree murder and first degree manslaughter are the "same offense" under the analysis set forth in Blockburger v. United States.  284 U.S. 299 (1932).  See People v. Biggs, 1 N.Y.3d 225, 771 N.Y.S.2d 49 (2003).

Mr. Cox's claim fails because the first degree manslaughter count here was carried over from the indictment in the first trial after the jury had not been able to reach a verdict on that count. It was not an attempt to retry the petitioner for the second degree murder charge.  The Supreme Court has consistently held that "a retrial following a 'hung jury' does not violate the Double Jeopardy Clause."  Richardson v. United States, 468 U.S. 317, 324 (1984); see also People v. Green, 96 N.Y.2d 195, 199, 726 N.Y.S.2d 357, 360 (2001) ("[T]he only count at issue in the retrial was the lesser driving while impaired charge for which the jury had failed to reach a verdict.  At no point during the trial was the defendant in jeopardy of conviction of the greater offense.  Thus, there was no constitutional double jeopardy bar to the second trial.").

## 2.   Right to be Present

Mr. Cox next argues that during the second trial, he was deprived of his right to present during the jury selection process. Specifically, he alleges that he was absent when defense counsel

48

made peremptory challenges and challenges for cause and that this
violated his constitutional and statutory right to be present
during all material stages of trial.   (Pet. Memo. at 75-80).
Further, he asserts that he was denied his right to be present at
sidebar conferences with jurors in the robing room during voir dire
as guaranteed by Antommarchi.   The petitioner contends that had his
appellate counsel raised these claims, he would have prevailed on
appeal.

Jury selection for the petitioner's second trial took place on
September 11 and 13, 1996.   In his opening remarks, the judge told
all members of the jury panel, "[I]f I have reason to believe that
I asked you a question that's on the personal side, and I will, I
will always invite you in the robing room and then you may tell us
whatever it is, out of everybody's hearing."   (Tr. vol. 1 at 11).
Three rounds of voir dire were necessary to select a jury.   During
each round, several members of the panel were invited into the
robing room to discuss potential bias issues.   (Tr. vol. 1 at 59-
78, 168-82, 244-69, 284-87).   Later, counsel for both sides met in
the robing room with the judge to discuss challenges for cause and
peremptory challenges.   (Tr. vol. 1 at 125-42, 208-13, 288-97).

The record does not reflect who was in attendance during these
conferences.   Contrary to the petitioners' contention, the mere
fact that his name does not appear on the record is not sufficient
to prove his absence.   See People v. Velasquez, 1 N.Y.3d 44, 48,

49

769 N.Y.S.2d 156, 158 (2003).  However, there are other indications that he was not present at times.  For example, during a conference with a prospective juror, the judge asks, "Would that fact cause you to extend sympathy to the young man out there?"  (Tr. vol. 1 at 60-61).  Later, when defense counsel is listing his peremptory challenges, the judge interrupts.

> The Court: How about Pisatelli?
>
> Mr. Heinrich: . . . Give me one minute to confer with my client.
>
> The Court: You want to bring him in here, you may.
>
> Mr. Heinrich: I don't want to.

(Tr. vol. 1 at 133-34).  In the same conference, the court reminds the defense counsel that he cannot challenge every juror.

> The Court: You've only got fifteen.
>
> Mr. Heinrich: I understand that.
>
> The Court: You know now that you're going to be under observation.
>
> Mr. Heinrich: I understand.
>
> The Court: I suggest you tell that to your client or do you want me to bring him in and tell him he's only got fifteen?
>
> Mr. Heinrich: That's what I went out and discussed it.

(Tr. vol. 1 at 141).

### a.   Challenge Conferences

The petitioner claims that he was deprived of his right to be

present at material stages of trial because he was absent from challenge conferences.  However, there is no constitutional right to attend challenge conferences in chambers.  Cohen v. Senkowski, 290 F.3d 485, 490 (2d Cir. 2002) (finding procedure adequate where, even though defendant not present, he was represented by counsel and had opportunity to register his opinions with counsel before challenges were made).  Likewise, the New York Court of Appeals has refused to read into CPL § 260.20 a right to attend challenge conferences, noting that "in chambers discussion [is merely a] preliminary advisement of the court of challenges later effectuated in open court," and that the defendant's presence during voir dire and during the removal of jurors from the panel is adequate to guarantee his constitutional and statutory rights.  People v. Velasco, 77 N.Y.2d 469, 473, 568 N.Y.S.2d 721, 723 (1991).

    In this case, the record indicates that Mr. Cox had the opportunity to consult with counsel about the challenges he wanted to make.  For example, during the first round of challenges, defense counsel excused himself, saying "[g]ive me one moment to confer with my client." (Tr. vol. 1 at 133).  Later, he stated, "My client has a visceral reaction to the man, period.  That's sometimes what peremptory challenges are." (Tr. vol. 1 at 142).  The record also confirms that the challenges discussed in the conferences were later effectuated in open court. (Tr. vol. 1 at 125-42, 208-13, 288-97).  Finally, the petitioner does not contest

that he was present in the courtroom as jurors were excused.

b.   Sidebar Conferences with Jurors

Mr. Cox next challenges his exclusion from individual conferences with prospective jurors in the robing room during which their background and ability to weigh the evidence objectively was explored.   The right to be present during such sidebar voir dire was established as a matter of state law in Antommarchi.   80 N.Y.2d at 250, 590 N.Y.S.2d at 35 (reading CPL § 260.20 to include right to attend conferences to observe jurors' responses to "questions intended to search out . . . bias, hostility, or predisposition" to better inform his challenges).   Because there is no equivalent guarantee in the federal Constitution, this claim is typically not cognizable on habeas corpus review.   See United States v. Feliciano, 223 F.3d 102, 111 (2d Cir. 2000), cert. denied, 532 U.S. 943 (2001); Morales v. Artus, 05 Civ. 3542, 2006 WL 3821488, at *18 (S.D.N.Y. Dec. 28, 2006).   Here, however, the petitioner has cloaked his claim as ineffective assistance of counsel under the Sixth Amendment, and so the Court may consider it.

After determining that this claim had potential merit and that the record was sufficiently ambiguous that an evidentiary hearing might be necessary to determine the extent to which the petitioner was present during voir dire, I appointed counsel for Mr. Cox. (Memorandum and Order dated April 9, 2007).   The petitioner's claim must fail, however, because portions of the record submitted

52

thereafter by the respondent show that Mr. Cox waived his
Antommarchi rights at trial.

> The Court: Now, during the course of the trial, I am
> going to ask those potential jurors whether any relative,
> anyone close to them, was ever arrested or convicted of
> a crime.  If they raise their hand, then in that event,
> when I have to question them further, I do it in the
> robing room.  You have a right to be in the robing room
> to hear that or, you can waiver your right to be in the
> robing room . . . .  Speak to your lawyer and tell me
> what your desire it.
>
> Mr. Cox: Yes, I will remain seated.
>
> The Court: You wish to waive your right and remain
> seated?
>
> Mr. Cox: Yes.

(Antommarchi Tr. at 4).[21]

"Because [a] defendant ha[s] a fundamental right to be
present," the failure to object to exclusion from sidebar voir dire
at trial is not fatal to an Antommarchi claim.  Antommarchi, 80
N.Y.2d 247 at 250, 590 N.Y.S.2d at 35.  However, New York courts do
recognize that Antommarchi rights can be waived by exhibiting "a
voluntary, knowing and intelligent" waiver.  People v. Vargas, 88
N.Y.2d 363, 375-76, 645 N.Y.S.2d 759, 764 (1996).  An Antommarchi
waiver need not be made in the defendant's own voice; it can be

---

[21] "Antommarchi Tr." refers to the transcript of proceedings on
September 11, 1996, which were not originally transcribed by the
court reporter, Deirdre Randles.  At the respondent's request, Ms.
Randles transcribed this portion of the trial.  She does not know
why these notes were not initially transcribed.  (Affidavit of
Deirdre Randles dated Aug. 9, 2007).

expressed instead by defense counsel, <u>People v. Velez</u>, 8 A.D.3d 21, 22, 777 N.Y.S.2d 495, 496 (1st Dep't 2004). However, in the latter case, there must be some evidence that the defendant intended to surrender his rights, for example, when the waiver is made in the presence of the defendant. <u>See</u> <u>People v. Keen</u>, 94 N.Y.2d 533, 536, 707 N.Y.S.2d 380, 381 (2000); <u>People v. Brown</u>, 256 A.D.2d 92, 92-93, 682 N.Y.S.2d 572, 572-73 (1st Dep't 1998). If the defendant was not present at sidebar conferences, it the prosecution's burden to prove that a valid waiver occurred. <u>People v. Lucious</u>, 285 A.D.2d 968, 969, 730 N.Y.S.2d 384, 385 (4th Dep't 2001). "A waiver will not be inferred from a silent record." <u>People v. Lucious</u>, 269 A.D.2d 766, 767, 704 N.Y.S.2d 758, 760 (4th Dep't 2000).

The respondent argues that the petitioner waived his <u>Antommarchi</u> right through his counsel's statement "I don't want to" in response to an invitation by the court to bring him in the robing room. (Tr. vol. 1 at 133). This would not be sufficient to constitute a waiver under New York law, as it would effectively transfer the petitioner's decision-making power to his attorney. <u>Antommarchi</u>, 80 N.Y.2d at 250, 590 N.Y.S.2d at 35. However, the petitioner's earlier statements in his own voice that he wished to "remain seated" (Antommarchi Tr. at 4) clearly conveyed his intent to waive the right and remain in the courtroom.

Finally, the petitioner argues that the new transcript does not dispose of his ineffective assistance claim because it was not

54

a part of the record at the time that the Appellate Division denied his appeal. (Letter of Rico Cox dated Sept. 5, 2007). Therefore, he claims, his appellate counsel's performance could still be seen as deficient. However, to prevail on an ineffective assistance claim, the petitioner must show that counsel's errors caused prejudice to his case. If appellate counsel had raised this claim and it was not rejected outright, the Appellate Division would most likely have ordered a reconstruction hearing due to the ambiguity in the record. <u>See</u> <u>Velasquez</u>, 1 N.Y.3d at 49, 769 N.Y.S.2d at 59 (finding reconstruction hearing to be appropriate where "it is clear that a proceeding took place that was not transcribed; the minutes have been lost; or there is significant ambiguity in the record); <u>People v. Velez</u>, 304 A.D.2d 391, 756 N.Y.S.2d 848, 849 (1st Dep't 2003) (remanding where defendant's <u>Antommarchi</u> waiver could not be divined from the record). At that stage, if not earlier, the court would have uncovered Mr. Cox's waiver. This argument therefore fails.

### 3.   Other Ineffective Assistance Claims

The petitioner also contends that his appellate counsel's failure to request oral argument before the Appellate Division on his <u>Brady</u> claims amounted to ineffective assistance. He alleges that counsel promised his family that he would make the request but did not do so, instead falsely informing them that his request had been denied. (Pet. Memo. at 60). Mr. Cox has not substantiated

55

these allegations.  Moreover, even if they were true, the failure
to request argument on claims that counsel had already fully
briefed in his papers does not fall outside the "wide range of
reasonable professional assistance" set forth in <u>Strickland</u>.  466
U.S. at 689.  Finally, the petitioner has made no showing of
prejudice.

Next, the petitioner contends that his appellate counsel
failed to assemble the appellate brief properly, omitting minutes
that he referenced from the first trial and submitting an defective
index.  (Pet. Memo. at 60-61).  Again, these errors are not so
egregious as to have fallen below the standard of reasonably
competent assistance and the petitioner has not shown that they
affected the Appellate Department's adjudication of the appeal.

Finally, Mr. Cox faults his appellate attorney for failing to
obtain minutes from his CPL § 330.30 hearings on jury misconduct,
"at least . . . to determine if there exist a (sic) issue that
would warrant a reversal" of his conviction.  (Pet. Memo. at 61).
However, appellate counsel is not required to "advance every
argument, regardless of merit, urged by the appellant." <u>Evitts v.</u>
<u>Lucey</u>, 469 U.S. at 394.  The petitioner has not shown that the
claim was so central to the appeal that counsel's failure to press
it was unreasonable.  Furthermore, the petitioner has not specified
any conduct uncovered during the § 330.30 hearings that would have
warranted setting aside the verdict, and thus he has not shown

prejudice.

    E.   <u>Sufficiency of the Evidence</u>

    Mr. Cox contends that the evidence presented at his second trial was insufficient as a matter of law to support convictions for the first degree manslaughter of Ervin Edwards and the second degree attempted murder of Darren Dingle.

    The standard for habeas corpus review of such claims is well established. A defendant "challenging the sufficiency of the evidence underlying his conviction" bears "'a very heavy burden.'" <u>Knapp v. Leonardo</u>, 46 F.3d 170 (2d Cir. 1995) (quoting <u>United States v. Ragosta</u>, 970 F.2d 1085, 1089 (2d Cir. 1992)). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 97 (2d Cir. 1999) (quoting <u>Herrera v. Collins</u>, 506 U.S. 390, 401 (1993)). The Court must "decide whether the record is 'so totally devoid of evidentiary support that a due process issue is raised.'" <u>Bossett v. Walker</u>, 41 F.3d 825, 830 (2d Cir. 1994) (quoting <u>Mapp v. Warden, New York State Correctional Institute for Women</u>, 531 F.2d 1167, 1173 n.8 (2d Cir. 1976)).

    The cumulative evidence introduced at trial was sufficient to support a conviction for first degree manslaughter. Witnesses placed the petitioner at the scene of the crime, fighting with Mr.

Edwards.   Mr. Edwards' statements to Aaron "Bucky" Fields and Officer Carson implicated the petitioner.  Makeda's story wavered, but she did testify that she saw the petitioner fire a gun.  (Tr. vol. 2 at 233-34).   The federal court must defer to the jury's resolution of any conflicts in the testimony and to its assessment of the credibility of witnesses, and construe the evidence in the light most favorable to the prosecution.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

The same is true of the conviction for second degree attempted murder.  The petitioner and Mr. Hardy approached Mr. Edwards and Mr. Dingle together.   Witnesses testified that they were both armed.  Mr. Hardy fired at Mr. Dingle as he fled.  Even if the jury did not have sufficient evidence to support the theory that Mr. Cox also fired at Mr. Dingle, it had enough to conclude that the petitioner understood Mr. Hardy's intentions to go after him and that the two shared a "community of purpose."  People v. Cabey, 85 N.Y.2d 417, 421, 626 N.Y.S.2d 20, 22 (1995) (quoting People v. Allah, 71 N.Y.2d 830, 832, 527 N.Y.S.2d 731, 732 (1988).  For these reasons, the petitioner's claim must fail.

F.   Actual Innocence

Finally, the petitioner asserts that he is actually innocent and cites affidavits and reports discussed elsewhere in his petition for support.  He also relies on the grand jury testimony of a witness indicating that Mr. Hardy shot Mr. Edwards and a line-

up sheet indicating that a "Jay Brown" was identified as the perpetrator. (Grounds for Petition at 4). Far from demonstrating that Mr. Cox is actually innocent, the "new" evidence he points to rehashes the same arguments that have already been entertained by the state courts. The threshold showing required for federal habeas relief on actual innocence grounds is very high. It requires that the petitioner show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Dunham v. Travis</u>, 313 F.3d 724, 730 (2d Cir. 2002) (citing <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). The petitioner has not met his burden here.

<u>Conclusion</u>

For the reasons set forth above, I recommend that Mr. Cox's petition for a writ of habeas corpus be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Paul A. Crotty, Room 2101, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           October 10, 2007

Copies mailed this date to:

Rico Cox
97-A-2559
Otisville Correctional Facility
P.O. Box 8
Otisville, New York 10963

Christopher John Blira-Koessler, Esq.
Assistant District Attorney
198 East 161st Street
Bronx, New York 10451