USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 5, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
RICO COX,                                   :
                                            :
                    Petitioner,             :        06 Civ. 3159 (PAC) (JCF)
                                            :
        - against -                         :        ORDER
                                            :
ROBERT EBERT, Superintendant,               :
Otis Correctional Facility,                 :
                                            :
                    Respondent.             :
------------------------------------------------------x

HONORABLE PAUL A. CROTTY, United States District Judge:


Petitioner Rico Cox ("Cox") petitions the Court for a writ of habeas corpus under 28 U.S.C. § 2254,

challenging his convictions in New York State Supreme Court for manslaughter in the first degree and

attempted murder in the second degree.  On October 10, 2007, Magistrate Judge James C. Francis IV issued a

Report & Recommendation ("R&R") recommending that Cox's petition be denied.  Having reviewed the R&R,

as well as Cox's timely objections, the Court ADOPTS Magistrate Judge Francis's recommendations in their

entirety and DENIES Cox's petition.


## BACKGROUND

### I.      Facts[1]

On March 16, 1993, at approximately 5:00 p.m., Cox, Leon Hardy, and an unidentified third man

confronted Ervin Edwards and Darren Dingle in a courtyard that serves as the entrance to a Bronx apartment at

1162 and 1164 Sheridan Avenue.  Edwards and Cox began to quarrel and fist-fight.  During the fight, Hardy

and the unidentified third man pulled out guns and Dingle fled.  Hardy chased Dingle and fired several shots in

his direction.  The shots missed Dingle.

---

[1] The facts of this section are taken from the R&R.

In the courtyard, Edwards lay wounded on the ground with blood flowing from his stomach, chest, and mouth. Edwards' friend, Aaron "Bucky" Fields, saw Edwards and asked what happened. Edwards replied, "Rico."

Police Officer Carson ("P.O. Carson") was the first policeman to arrive at the scene. He attended to Edwards. Medical personnel soon arrived and carried Edwards into an ambulance. Fields climbed into the ambulance with Edwards and questioned Edwards about the events. Edwards responded, "Rico man just wild out. He just flipped and went crazy." Edwards died later that evening. On March 25, 1993, Cox and Hardy were apprehended by law enforcement officials in Albany, New York. The unidentified third man was never found. In February 1995, Hardy pled guilty to second-degree attempted murder of Dingle.

## II.    Procedural History

### A.    The Trials

Cox was charged with one count of second-degree murder and one count of first-degree manslaughter relating to the death of Edwards. (R&R at 3.) Cox was also charged with one count of second-degree attempted murder relating to Dingle. (R&R at 3.) Cox was tried in March and April of 1995, and was acquitted of the second-degree murder charge relating to the death of Edwards. (R&R at 3.) The jury was unable to reach a verdict on the other charges, resulting in a mistrial. (R&R at 3.) In September 1996, Cox was retried on the first-degree manslaughter and second degree attempted murder charges. (R&R at 3.)

At the second trial, Dingle testified that he did not see the actual fight between Cox and Edwards, nor did he see Cox pull out a gun at any time. (R&R at 4.) P.O. Carson testified that before dying, Edwards stated, "Rico Cox shot me" and gave P.O. Carson Cox's home address. (R&R at 5.) Makeda Clarke, a thirteen-year-old girl at the time of the shooting, provided conflicting testimony as to what she witnessed from the fifth floor of a building overlooking the courtyard. (R&R at 5.) At first, Clarke testified that no one in the courtroom was present at the crime scene. (R&R at 5.) When Assistant District Attorney Allen Karen ("ADA Karen") refreshed Clarke's memory with her grand jury testimony, however, Clarke testified that she did in fact see Cox

2

and Edwards fighting; that Cox had a gun in his hand; and that Cox fired the gun. (R&R at 5.)  Clarke was unable to determine Cox's target. (R&R at 5.)

During cross-examination, Clarke testified that her testimony was based on rumors and that she only testified to witnessing the murder because she was told she would get in trouble if her testimony conflicted with prior testimony. (R&R at 6.)  After the court prodded Clarke, she said, "I saw [Rico Cox] with a gun . . . . I didn't see him shoot nobody.  But I saw the other boy shoot somebody—because the gun was down." (R&R at 6.)  The trial judge denied defense counsel's motion to dismiss both counts against Cox for failure to establish a prima facie case as to each element of the crimes charged. (R&R at 6-7.)  On September 24, 1996, the jury convicted Cox of first-degree manslaughter for the death of Edwards and second-degree attempted murder of Dingle. (R&R at 7.)

## B.    Post-Trial Motions

In March, 1997, pursuant to N.Y. Crim. Proc. Law § 330.30, Cox moved to set aside the verdict, arguing that the jurors engaged in improper discussions of the evidence and formed opinions prior to the deliberations. (R&R at 7.)  On March 27, 1997, the motion was denied and Cox was sentenced to concurrent indeterminate prison terms of eight and one third to twenty-five years. (R&R at 8.)

In April, 2000, Cox retained counsel and, pursuant to N.Y. Crim. Proc. Law § 440.10(1)(f) and (h), moved to vacate his conviction, citing  Brady[2] and Rosario[3] violations.  Specifically, Cox argued that the prosecution failed to disclose: (i) an "Unusual Occurrence Report" that did not mention Edwards' statement that Cox had shot him; (ii) statements that Dorrett Clarke, Makeda Clarke's mother, allegedly made to the prosecution indicating that Makeda Clarke had not witnessed the shooting; and (iii) Makeda Clarke's criminal record. (R&R at 8.)

---

[2] Brady v. Maryland, 373 U.S. 83 (1963), held that, in a criminal case, the prosecution is required under the Fourteenth Amendment to disclose any material evidence favorable to the defendant.

[3] People v. Rosario, 173 N.E.2d 881 (N.Y. 1961), requires that the prosecution disclose any prior statements made by any of its witnesses relating to the subject matter of the witness's testimony.

In November, 2000, a hearing was held, during which both Mr. Heinrich, Cox's trial lawyer, and Dorrett Clarke testified. (R&R at 8.)  Before a decision was rendered, Cox sent a pro se letter requesting that the court consider a sworn affidavit by Makeda Clarke ("Clarke Affidavit").  Cox alleged that his attorney had failed to introduce the Clarke Affidavit into evidence. (R&R at 9.)  The Clarke Affidavit stated that Makeda Clarke had not witnessed the shooting, had told this to ADA Karen, but had testified to witnessing the shooting only because ADA Karen used Makeda Clarke's prior arrest record to coerce her to testify. (R&R at 9.)  The court denied Cox's request because the hearing was closed and recommended that Cox file a separate affidavit on the matter. (R&R at 9.)  After Cox's lawyer failed to file a separate affidavit, Cox moved pro se, pursuant to N.Y. C.P.L.R. § 2221, for a rehearing on his motion to vacate. (R&R at 9.)  The court denied the motion because: (i) the defense had in fact received a copy of the Unusual Occurrence Report; (ii) Dorrett Clarke was not a credible witness; and (iii) ADA Karen was unaware of Makeda's Clarke's prior conviction because the conviction had been recorded under an alias with a different date of birth. (R&R at 10.)

In November, 2001, Cox appealed both his conviction and the denial of his motion to vacate to the Appellate Division, First Department. (R&R at 10.)  He argued that: (i) the prosecution violated Brady for failing to turn over exculpatory information and relying on perjured testimony; (ii) the evidence against him was insufficient as a matter of law; (iii) the trial court handled Makeda Clarke's testimony prejudicially; (iv) his trial counsel was ineffective for failing to effectively cross-examine P.O. Carson; and (v) the court erred in declining to entertain his pro se motion to reopen the § 440.10 hearing. (R&R at 10.)

On September 24, 2002, the Appellate Division affirmed the trial court's judgment. (R&R at 10.)  The Appellate Division held that: the evidence against Cox was legally sufficient to support a conviction; there were no Brady violations; and that Cox's trial counsel was effective in representing Cox. (R&R at 10.)  The Appellate Division also found that the trial court properly denied his motion to vacate, holding that the Clarke Affidavit was not introduced at the proper time and would not have affected the result of the hearing. (R&R at 11.)  The New York Court of Appeals denied leave to appeal. (R&R at 11.)

4

In February, 2004, Cox filed a <u>pro se</u> <u>coram</u> <u>nobis</u> petition to set aside the verdict for ineffective assistance of appellate counsel. (R&R at 11.)  Specifically, Cox argued that his attorney failed to raise double jeopardy and <u>Antommarchi</u> claims.[4] (R&R at 11.)  The Appellate Division denied Cox's <u>coram</u> <u>nobis</u> petition, Cox's subsequent application to reargue the motion, and Cox's application for reconsideration of the decision denying leave to appeal. (R&R at 11.)

In July, 2005, Cox retained a new attorney and filed a second motion to vacate his conviction under Crim. Proc. Law § 440.10(1)(b), (c), (f), and (h). (R&R at 12.)  Cox again argued that: (i) the prosecution had violated his rights under <u>Brady</u> and <u>Rosario</u>; (ii) Makeda Clarke committed perjury; (iii) the prosecution knowingly used perjured testimony to secure his conviction; and (iv) he was denied effective assistance of trial counsel. (R&R at 12.)  The court denied the motion as well as Cox's application for leave to appeal the denial of the motion. (R&R at 12.)

### C.      Petition for a Writ of Habeas Corpus

On February 27, 2006, Cox filed this habeas corpus petition pursuant to 28 U.S.C. § 2254.[5]  Magistrate Judge Francis initially appointed a new attorney to represent Cox in connection with his <u>Antommarchi</u> claim and any other claim that warranted representation. (R&R at 12.)  Subsequently, on August 10, 2007, however, the government submitted a trial transcript revealing that Cox had waived his <u>Antommarchi</u> rights and Magistrate Judge Francis relieved Cox's counsel.  (R&R at 12-13.)

Cox's habeas corpus petition challenges his conviction for manslaughter in the first degree and attempted murder in the second degree.  Specifically, Cox contends that: (i) the prosecution withheld exculpatory evidence in violation of <u>Brady</u>; (ii) the prosecution knowingly used perjured testimony to secure his conviction; (iii) the trial court abused its discretion in refusing to reopen a hearing on a motion to vacate his

---

[4] <u>People v. Antommarchi</u>, 80 N.Y.2d 247 (1992), establishes a defendant's right to be present during sidebar conferences with prospective jurors during voir dire if the sidebar is material to the trial.  Defendants are entitled to hear questions intended to search out a prospective juror's bias, hostility, or predisposition to believe or discredit the testimony of potential witnesses.

[5] The R&R at 12 states that the petition was filed on February 27, 2006.  Both the ECF docket sheet and the U.S. District Court stamp on the petition indicate that the petition was filed on April 25, 2006.

conviction; (iv) both his trial and appellate counsel were ineffective, in violation of the Sixth Amendment; and (v) the prosecution failed to prove his guilt beyond a reasonable doubt.

Magistrate Judge Francis reviewed Cox's habeas corpus petition and found Cox's arguments meritless. Consequently, on October 10, 2007, Magistrate Judge Francis issued an R&R recommending that Cox's petition for a writ of habeas corpus be denied.[6]   On November 26, 2007, Cox filed a 44 page objection to the R&R, containing fifty-five enumerated errors in Magistrate Judge Francis' R&R ("Obj.").[7]

## DISCUSSION

### I.      Standard of Review for a Report and Recommendation

A district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1).  When a timely objection has been made to the magistrate's recommendations, the Court is required to review the contested portions de novo. Pizarro v. Bartlett, 77 F. Supp. 815, 817 (S.D.N.Y. 1991).  The Court, however, "may adopt those portions of the Report to which no objections have been made and which are not facially erroneous." La Torres v. Walker, 216 F. Supp. 2d 157, 159 (S.D.N.Y. 2000).

### II.     Cox's Objections

Cox's 55 enumerated errors contain four principal objections to the R&R: (A) the R&R fails to properly address Brady violations in connection with the prosecution's failure to turn over exculpatory evidence and impeachment material (Generally Objections 1-16); (B) the R&R fails to properly address Cox's claims that the prosecution relied on perjured testimony (Generally Objections 17-27); (C) the R&R fails to properly address Cox's ineffective assistance of trial and appellate counsel claims (Generally Objections 28-48); and (D) the

---

[6] The R&R dismissed petitioner's Rosario claims since the Rosario rule is grounded in state law and a violation of it is not a deprivation of a constitutional right. (R&R at 13 n.7.)  Cox did not object to the dismissal of his Rosario claims.

[7] Cox argues that Magistrate Judge Francis did not apply the correct standard of review under the AEDPA. (Obj. No. 55, pg. 44.) Magistrate Judge Francis correctly noted, however, that although Cox's petition was filed after the effective date of the AEDPA, his habeas petition's claims fail under the less deferential pre-AEDPA standard and thus analysis under the AEDPA is unwarranted. (R&R at 13, n. 6.)

R&R fails to properly address Cox's insufficiency of the evidence claims in connection with the charges of first degree manslaughter and second degree attempted murder.[8] (Generally Objections 48-55)  None of the objections have merit.

### A.   Brady Claims

Cox argues that the prosecution suppressed exculpatory evidence in violation of his <u>Brady</u> rights. Specifically, Cox argues that <u>Brady</u> violations occurred when the prosecution: (1) denied him access to his codefendant's plea minutes, (2) failed to adequately disclose DD5 # 7, (3) failed to disclose Dorrett Clarke's statements to ADA Karen, (4) withheld Ervin Edwards' criminal record, (5) withheld the criminal record of Makeda Clarke, (6) failed to produce the police documents and reports that omitted Cox's name, and (7) redacted the DD5s.  Additionally, Cox challenges Magistrate Judge Francis's analytical approach to his <u>Brady</u> claims, arguing that his <u>Brady</u> claims should be considered based on their collective impact, not individually.

The prosecution has a constitutional obligation to disclose exculpatory evidence to the defendant. <u>Brady</u>, 373 U.S. at 87.  <u>Brady</u> violations have three components.  First, "[t]he evidence . . . must be favorable to the accused, either because it is exculpatory, or because it is impeaching." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-282 (1999).  Second, the "evidence must have been suppressed by the State, either willfully or inadvertently." <u>Id.</u> at 282.  Third, "[a] finding of materiality of the evidence is required." <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).  Exculpatory evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Strickler</u>, 527 U.S. at 280. Nondisclosure merits relief only if the prosecution's failure "'undermines confidence in the outcome of the trial.'" <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995).  A petitioner that received a fair trial does not have a viable habeas corpus petition. <u>Id.</u>

---

[8] Cox argues that the trial court incorrectly denied him a hearing based on (1) the unredacted DD5s, (2) the reports prepared by Martinez, (3) Makeda Clarke's testimony, (4) Prosecutorial misconduct, and (5) ineffective counsel.  (Obj. Nos. 3, 9, 24, 27, 38, and 46.)  For the reasons stated in the following sections, however, the denial of a hearing based on these issues was reasonable.

### 1. Codefendant's Plea Minutes

Cox argues that the prosecution violated his <u>Brady</u> rights when ADA Karen failed to disclose the plea minutes of codefendant Leon Hardy.  (Obj. No. 13, pg. 18.)  Cox contends that there is a reasonable possibility that the failure to disclose the plea minutes contributed to the verdict because the plea minutes could (i) have influenced the jury to believe that Hardy acted alone when shooting at Darren Dingle, (ii) rebutted the prosecution's misrepresentation of facts in the opening statement, and (iii) shown that Leon Hardy was the person who shot the deceased.

Cox, however, was convicted under an "acting in concert" theory.  The "acting in concert" theory does not require Cox to actually have fired a shot to be convicted of attempted murder or manslaughter. N.Y.P.L  § 20.00.  Additionally, information from the co-defendant's plea minutes would be irrelevant to Cox's mental culpability, which the prosecution is required to establish under the "acting in concert" theory.  <u>Id</u>.  Therefore, there is no reasonable possibility that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.[9]

### 2.  DD5 # 7

Cox argues that the prosecution violated his <u>Brady</u> rights when it turned over DD5 # 7 with an illegible section regarding the shooting the night before the murder of Mr. Edwards. (Obj. No. 14, pg. 18.)  Furthermore, Cox argues that the information in DD5 # 7 regarding the shooting in the area the night before is not redundant, and that the poor quality of the copies hindered defense counsel's efforts to build his case. (Obj. Nos. 15 – 16, pg. 18-19.)  Cox claims that a shooting the night before in the same area undermines the prosecution's hypothesis that all three men who confronted Mr. Edwards carried guns.

The prosecution's ballistics expert testified, however, that the shells could have been fired weeks before the murder and could have been fired from 6 different guns. (Trial Transcript ("Tr.") vol. 2 at 59-61.)[10]  This

---

[9] Furthermore, Cox argues that testimony that places Cox at the scene of the crime insufficient to overcome his <u>Brady</u> claims. (Obj. No. 1, pg. 1-2.)  Cox's conviction, however, was based on evidence other than his mere presence at the crime scene.

[10] "Tr." refers to defendant's second trial that commenced in September, 1996.

testimony vitiates Cox's theory.  Therefore, the Court does not need to evaluate Cox's claims regarding the legibility of DD5 # 7.  Given the totality of other evidence against Cox, there is no reasonable possibility that the verdict would have been different based on evidence that only partially harms the prosecution's theory.[11]

### 3.  Dorrett Clarke's Statements to ADA Karen

Cox further argues that the prosecution failed to disclose Dorrett Clarke's affidavit, which shows that Dorrett met with ADA Karen and conveyed exculpatory information regarding Cox. (Obj. No. 9, pg. 9-12.) The trial Court determined, however, this meeting never actually occurred.  ADA Karen testified that he never met with Dorrett Clarke.  Ruling on Cox's motion to vacate, the trial court credited ADA Karen's testimony, not Dorrett Clarke's, and found that Dorrett had never met with ADA Karen.  A state court's holding on a factual issue is entitled to a presumption of correctness, a presumption that is rebutted only if the petitioner can show by clear and convincing evidence that the "court's factual determinations are not fairly supported by the record." Morris v. Reynolds, 264 F.3d 38, 47 (2d Cir. 2001).  The record indicates that "Ms. Clarke's testimony concerning the alleged meeting was extremely fuzzy, as she was unable to recollect the date, month, or even the season of the alleged encounter." (R&R at 23.)  Accordingly, Cox's Brady claim fails because the prosecution did not suppress any exculpatory evidence.

### 4.  Ervin Edwards' Criminal Record

Cox argues that the prosecution's failure to disclose Ervin Edwards' criminal record was a Brady violation because his criminal record could have been used for impeachment purposes.  (Obj. No. 9, pg. 12.) Exculpatory evidence is only material, however, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler, 527 U.S. at 280. The record indicates that Mr. Edwards allegedly assaulted a man with a baseball bat and a garbage can in 1991.

---

[11] Cox also claims that his trial counsel was ineffective because a portion of document DD5 #7 was illegible and he did not request a complete copy. (Obj. No. 35, pg. 30.)  This claim fails for the same reasons.

(Arrest Report of Ervin Edwards, attached as Exh. 11 to Second Motion to Vacate).  Cox fails to assert, however, how Mr. Edwards' assault in 1991 would impeach Mr. Edwards' statement to P.O. Carson that "Rico Cox shot me."  The suggestion that someone else had a motive to kill the victim was speculative and cannot support a <u>Brady</u> claim.  Additionally, a third party's five year old assault charge has little probative value when used to rebut the dying declaration identifying the shooter as Rico Cox.

### 5.  Makeda Clarke's Criminal Record

Cox argues that the prosecution failed to disclose that Makeda Clarke had a criminal record that included: a conviction, two pending charges, and a promise of leniency for testifying against Cox. (Obj. No. 4, pg. 10-11.)  Cox contends that this information would have discredited Makeda Clarke's testimony.  Cox, however, cannot demonstrate prejudice.  Under the materiality requirement in <u>Brady</u>, a petitioner must show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles</u>, 514 U.S. at 435.  The Court will generally not find a <u>Brady</u> violation when the testimony at issue is "'corroborated by other testimony,' or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." <u>U.S. v. Payne</u>, 63 F.3d 1200, 1210 (2d Cir. 1995).  Defense counsel impeached Makeda Clarke through vigorous cross-examination.  Accordingly, the impeachment value of Clarke's criminal record was nominal; it would not have affected the jury's verdict.  Since Cox has not demonstrated that Makeda Clarke's undisclosed criminal record prejudiced the trial's outcome, his <u>Brady</u> argument fails.

### 6.  Police Reports

Cox further argues that he was prejudiced because the prosecution produced police reports that omitted his name.  Cox contends that the omission of his name from police records undermines P.O. Carson's testimony that Ervin Edwards identified petitioner as the person who shot him. (Obj. No. 8, pg. 8-9.)  Cox further argues

that the reports contained new information and thus were exculpatory. (Obj. No. 9, pg. 9.)[12]  The excluded police reports, however, do not contain any new information, and P.O. Carson claimed that he was told by Ervin Edwards that Cox was the shooter. Furthermore, Cox should have known that some reports omitted his name since several of them were in his possession. (R&R at 19.) (Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir. 2001) (no Brady violation where the defendant is aware of facts allowing him to take advantage of exculpatory evidence).  Cox could have used this information to undermine P.O. Carson's testimony by pointing out that the reports omitted his name despite P.O. Carson's testimony that Cox was identified by Ervin Edwards.  Having more reports that fail to identify Cox increases the impeachment value only incrementally and is insufficient to establish that the the additional impeachment evidence would have changed the verdict.[13]

7.  Redacted DD5s

Cox argues that the prosecution violated his Brady rights by redacting portions of the DD5s that the police created while investigating the crime.  Cox argues that these redactions suppressed critical information and that the failure to produce unredacted DD5s violates Brady.  Brady, however, does not require the Government to supply defendants with all the evidence in the Government's possession; rather, Brady requires only that the Government produce all the evidence necessary to ensure that defendants will not be denied access to exculpatory evidence. U.S. v LeRoy, 687 F.2d 610, 619 (2d Cir. 1982).

First, Cox argues that the redactions of DD5 #'s 13 and 16 suppressed the material fact that a person other than Cox was positively identified as a shooter of Ervin Edwards. (Obj. No. 3, pg. 3.)  While neither of the DD5's indicates the name of the other identified person, both DD5's clearly indicate that someone other than Cox was identified as the shooter.  ADA Karen testified that he redacted the names of witnesses that he did not plan on calling to the stand.  ADA Karen then did not redact any references to Cox.  Thus the probative value of

---

[12] Petitioner makes further objections under "Objection # 9" that address Sgt. Pegram's testimony and witness testimony placing petitioner at the scene. These objections are meritless for the reasons that follow.
[13] Cox argues that his (see pg. 9-10) trial counsel was ineffective because he failed to request unredacted copies of police reports. (Obj. No. 35, pg. 30.)  This claim fails for the same reasons.

this information lies in the existence of the other person, not his/her identity, and it could have been used as exculpatory evidence regardless of the redactions.[14]

Second, Cox argues that the redaction of Natasha Clarke's name from the DD5 prevented the defense from interviewing a witness that was in the same apartment as Makeda Clarke. (Obj. No. 4, pg. 4.)  Cox argues that this witness could have been used to discredit Makeda Clarke's testimony.  Any further impeachment of Makeda Clarke's testimony, however, would not have resulted in a different verdict.[15]

Third, Cox argues that the redactions of Dwight Furret and Natasha Clarke's address and apartment number prevented trial counsel from knowing that the witnesses were in the presence of Makeda Clarke.  (Obj. No. 12, pg.14-17.)  In support of this position, Cox cites People v. Lantigua, 228 A.D. 2d 213 (1st Dept. 1996), where the court overturned a murder conviction due to the prosecutor's failure to disclose that the primary witness was accompanied by another person.  This case is distinguishable.  In Lantigua, only one witness placed the defendant at the scene of the crime, the testimony of this witness lacked credibility, and the prosecutor made prejudicial statements.  In this case, by contrast, multiple credible witnesses placed Cox at the crime scene and the prosecutor did not make prejudicial statements.  Accordingly, Cox's claim that the prosecutor failed to reveal exculpatory evidence fails.

Fourth, Cox argues that ADA Karen refused to reveal the names of the witnesses. (Obj. No. 12, pg. 14.)  To support this argument, Cox points to a section of the pre-trial hearing where the defense counsel requested the names of witnesses and ADA Karen responded that there is no exculpatory evidence.  This, however, is insufficient to establish that ADA Karen refused to reveal the names of witnesses.  In fact, in the same pre-trial hearing, ADA Karen agreed to disclose the witnesses' names. (Pre Trial Hearing at 8-9.)

Fifth, Cox argues that the interviews of Natasha Clarke and Mr. Furret were exculpatory.  The interviews indicated that Mr. Furret identified a Hispanic person as committing the crime.  They further

---

[14] Objections Nos. 5, 6, 7, and 12 make the same argument that the redactions of other people's identities in the reports were exculpatory. These arguments are meritless on the same ground as Objection No. 3: the evidentiary value of these sources stems from the facts about the person, not their identity.

[15] Additionally, use of Natasha Clarke's testimony does not constitute a Brady claim, as discussed below in the analysis of Objection No. 12, pg. 14-17.

indicated that Natasha Clarke saw Darren Dingle running in a direction different from the direction that Leon Hardy claimed Darren Dingle ran (Obj. No. 12, pg. 14-17.)   The only material information the interviews contain, however, is that one witness identified the shooter as being of a race other than the race of Cox and that another witness recalled the events differently than Leon Hardy.  It is unlikely that this evidence would have affected the jury's assessment of Makeda Clarke's credibility, which had already been severely undermined. Furthermore, Cox could not use Ms. Clarke's and Mr. Furret's statements to rebut P.O. Carson's testimony since they do not contain any information that undermines the credibility of the victim's dying declaration.

Lastly, Cox argues that Mr. Furret's statement does not add to the evidence against him. (Obj. No. 12, pg. 16-17.)  Mr. Furret stated, however, that he saw a black man looking on as Dingle was being chased and that he then ran away with the shooter. This observation, in conjunction with Dingle's testimony, implicates Cox in the crime and would have worked against Cox, not in his favor. Accordingly, Cox has failed to show that Mr. Furret's statement was exculpatory.

### 8.  Holistic Analytical Approach

In addition to objecting to the R&R's analysis of his Brady claims, Cox also objects to the R&R's overall analytical approach.  Specifically, Cox argues that Magistrate Judge Francis should not have conducted an item-by-item evaluation of his Brady claims, but rather should have evaluated his Brady claims collectively to determine their aggregate merit. (Obj. No. 2, pg. 2.)  Courts should "evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  [The Court] evaluate[s] its cumulative effect for purposes of materiality separately." Kyles, 514 U.S. at 437 n.10.  Magistrate Judge Francis did exactly that: after evaluating Cox's Brady claims seriatim to determine their weight, Magistrate Judge Francis analyzed them in light of all the evidence and testimony presented at trial and determined the cumulative effect of the alleged error. (See R&R at 57.)

B.      **Perjured Testimony Claims**

Cox argues that the prosecution violated his due process rights by using the perjured testimony of Detective Martinez, P.O. Carson, and Makeda Clarke.  (Obj. No. 18, pg. 20.)   To succeed on this claim, Cox must demonstrate that (1) the prosecution knew or should have known of the perjury, and that (2) there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. <u>Drake v. Portuondo</u>, 321 F.3d 338, 345 (2d Cir. 2003).  Even where a prosecutor is unaware that the testimony was false, due process is violated where "the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" <u>U.S. v. Wallach</u>, 935 F.2d 445, 456 (2d Cir. 1991).

Cox argues that the prosecution knowingly used false testimony.  Specifically, when ADA Karen asked, "Was any other possible suspect ever identified other than Cox and Hardy by you?," the prosecution allowed Detective Martinez to answer, "[t]here was one more [suspect], but the third person wasn't identified" (Obj. No. 17, pg. 19.)  Cox argues that Detective Martinez could not have intended the statement to convey that the police never followed up on the third suspect since Detective Martinez prepared two photo arrays of Sean Edwards, from which one witness identified Sean Edwards as a shooter and another identified him as a participant in the crime.  Detective Martinez, however, could have intended that the police had not followed up and made an arrest of the third suspect.  (See R&R pg. 31.)  Furthermore, Cox fails to show a reasonable likelihood that the identity of the third person would have affected the jury's verdict.

Cox further argues that P.O. Carson committed perjury when he testified that he reported the excited utterance to Detective Martinez at 5:30 P.M, at the crime scene, while DD5 #3 demonstrates that, at 5:20 P.M., Detective Martinez was not at the crime scene, but at the hospital.  Cox similarly argues that Detective Martinez committed perjury when he testified that he was at the crime scene at 5:30 P.M. (Obj. No. 19, pg. 20.)  Cox argues that this testimony is material since it involves the way Cox's name came into the police investigation. (Obj. No. 20, pg. 21.)  Cox also argues that there was "a significant chance that this added item… could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction" since trial counsel could have

developed the issue of perjury with devastating effects to the prosecution's account of the excited utterance and the entire police investigation. (Obj. No. 21, pg. 22.)

The DD5s, however, do not unequivocally pinpoint the timing of Edwards' statement.  More importantly, Cox has not shown how the timing of the statement creates a reasonable likelihood that the jury verdict was prejudiced.

Cox next argues that the prosecution violated his due process rights as to Makeda Clarke's testimony. (Obj. No. 23, pg. 23.)  First, Cox argues that the prosecution coerced Makeda Clarke to testify. (Obj. No. 24, pg. 23.)  The Appellate Division considered and rejected Cox's claims of coercion, finding the coercion was not prejudicial.  Citing Ortega v. Duncan, 333 F.3d 102, 106 (2nd Cir. 2003), Cox argues that the presumption of correctness to findings of fact do not apply here since the court did not conduct an evidentiary hearing and therefore did not make any findings of fact.  In Ortega, however, the state court refused to make a finding as to the credibility of a witness. Ortega, 333 F.3d at 106.  Here, by contrast, there was no such refusal.  The Court thus grants the Appellate Division's conclusion of fact a presumption of correctness, and Cox has failed to rebut this presumption through clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Cox further argues that ADA Karen knowingly used perjured testimony to convict him. (Obj. No. 26, pg. 25.)  Cox further argues that the trial court found that Makeda Clarke's testimony material and determinative in petitioner's conviction. (Obj. No. 25, pg. 24-5.)   Cox points specifically to the trial court's denial of the defendant's motion to dismiss the charges based on the testimony of Makeda Clarke. (Tr. vol. 2 at 261-262.)  It is unlikely, however, that Makeda Clarke's testimony prejudiced Cox.  In its analysis, the trial court states "I'm not saying she is credible or suggesting that the jury has to accept it." (Tr. vol. 2 at 261.)  Thus the trial court held only that the State established a prima facie case.  Makeda Clarke's testimony thus did not prejudice the jury since Cox's defense counsel discredited her.  In fact, Makeda Clarke conceded upon cross-examination that she did not witness the shooting.[16]

---

[16] Cox also argues that Magistrate Judge Francis erred by evaluating his perjury claims based on their cumulative effect, not based on an item by item evaluation. (Obj. No. 18, pg. 20.)  The Court rejects this argument for the same reasons stated above, pg.13.

## C.       Ineffective Assistance of Trial Counsel

1.  Trial Counsel

Cox argues that his trial counsel's performance was deficient in several ways, violating his Sixth

Amendment right to effective representation.  Specifically, Cox argues that his trial counsel failed to: (a)

impeach P.O. Carson; (b) impeach Detective Martinez; (c) obtain unredacted copies of certain DD5s; and (d)

challenge the effectiveness of the police investigation.[17]

Under Strickland v. Washington, to prevail on an ineffective assistance of counsel claim, a petitioner

must demonstrate (1) that the representation he received "fell below an objective standard of reasonableness,"

and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." 466 U.S. 668, 688, 694 (1984).  A court reviewing a habeas corpus

petition should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance," id. at 689, and should not "second-guess trial counsel's defense strategy simply

because the chosen strategy has failed." U.S. v. DiTommaso, 817 F.2d 201, 216 (2d Cir. 1987).


(a)       P.O. Carson

Cox argues that his trial counsel was ineffective with respect to P.O. Carson because his trial counsel did

not try to impeach P.O. Carson using the (1) Unusual Occurrence Reports, (2) complaint or sprint report (the

"Complaint Report"), or (3) DD5 #2. (Obj. No. 37, pg. 31.)

Cox first argues that there was no tactical reason not to use the Unusual Occurrence Report and that, in

fact, the reports afforded some marginal benefits (Obj. Nos. 28; 30, pg. 31 and 33.)  Cox further argues that use

of the Unusual Occurrence reports would likely have changed the outcome of his trial. (Obj. No. 29, pg. 32.)

Cox argues that the Unusual Occurrence Report was exculpatory because the report said that the perpetrators

---

[17] Cox also argues that the cumulative effective of each and every instance of ineffective assistance of counsel should be determinative of his ineffective counsel claim.  (Obj. No. 39, pg. 50.)  For the reasons discussed below, the cumulative effects of petitioner's claims do not rise to the level of ineffective counsel.

were "three unidentified male blacks" and that the report should have said that one or more perpetrators were known to the police department since Edwards had identified Cox. (Obj. No. 28, pg. 25-6.)  It is likely, however, that had trial counsel attempted to impeach P.O. Carson using the Unusual Occurrence Report, P.O. Carson would have been forced to answer some of the questions dealing with the victim's statement "Rico Cox shot me."  It is plausible that trial counsel weighed the marginal benefit associated with the use of the reports against the detriment that would likely result from the witnesses repeatedly stating "Rico Cox shot me" in front of the jury, and decided not to use the reports.  It is therefore also reasonable that use of the Unusual Occurrence Report to impeach P.O. Carson would not have affected the jury's verdict and that P.O. Carson said "three unidentified male blacks" since he had not yet confirmed that "Rico Cox" was an actual name or a nickname. (Tr. vol. 2 at 134.)[18]

Cox further argues that his trial counsel was ineffective for failing to use the Complaint Report.  Cox claims that the Complaint Report is exculpatory since it omits Edwards' excited utterance. (Obj. No. 31, pg. 28.)  It is plausible, however, that the Complaint Report omitted the excited utterance since it contained Cox's name, and the authorities did not want Cox finding out that they were searching for him.

Additionally, at trial, P.O. Carson explained the absence of Cox's name from the Complaint Report, testifying that he did not broadcast Mr. Cox's name on the radio because "right after I put over the description of three male blacks leaving the scene, a 10-13 came over the air." [19] (Transcript for Motion to Vacate ("Va.") at 149-150.)[20]  By the time the 10-13 was over, Detective Martinez had arrived, so P.O. Carson felt it was sufficient to relay the information to him. (Va. at 154.) Cox argues that P.O. Carson's explanation is not credible since other calls came in over the radio during the 10-13, and when P.O. Carson did finally broadcast, he identified "3 male blacks," not "Rico Cox," by name. (Obj. No. 32, pg. 28.)   The actions of other officers during the 10-13, however, are insufficient to discredit P.O. Carson's judgment.  Additionally, P.O. Carson's

---

[18] Cox further argues that other witnesses placing him at the scene are irrelevant as to his claim that trial counsel should have used the Unusual Occurrence Report.  (Obj. No. 33, pg. 30.)  The Court, however, does not need to address this issue since trial counsel was not ineffective for not using the Unusual Occurrence Report.

[19] A "10-13" is a radio call for officer assistance during which all non-priority radio transmission must be suspended.

[20] "Va." refers to petitioner's first motion to vacate, filed in April 2000.

statement that they were looking for "3 black men" does not establish that P.O. Carson's testimony was incredible since the authorities were in fact looking for "3 black men" and there would be only a marginal benefit for broadcasting the name "Rico Cox."

Cox finally argues that trial counsel was ineffective for failing to use DD5 # 2 since the "document proves that Detective Martinez was at the hospital and not at the crime scene at the time P.O. Carson claimed to have reported the excited utterance to Detective Martinez." (Obj. No. 32, pg. 28-29.)  DD5 #2, however, is not inconsistent with P.O. Carson's testimony that Mr. Edwards identified Rico Cox as the shooter before the ambulance arrived.  Also, it is not likely that a jury would have interpreted any discrepancy in timing as a suggestion of perjury or as proof that Mr. Edwards did not identify Mr. Cox.

(b)   Detective Martinez

Cox argues that trial counsel was ineffective for failing to impeach Detective Martinez's corroboration of P.O. Carson's testimony using DD5 #3.  Cox argues that the document is important since it places Detective Martinez at Lincoln Hospital, where he received petitioner's name from an unknown source. (Obj. No. 34, pg. 30.)  As discussed above, however, the timing of P.O. Carson's communication with Detective Martinez would not likely have changed the jury's verdict.

(c)   Unredacted DD5's

First, Cox claims that trial counsel should have used DD5 # 16 to show that Sean Edwards was responsible for Ervin Edwards' death.  Cox claims that DD5 # 16 does not unequivocally place him at the scene since it does not contain his name. (Obj. No. 36, pg. 30.)  DD5 # 16, however, identifies the petitioner by lineup position, and it is unnecessary to identify Cox by name.

Second, Cox argues that the identity of the third person was relevant in spite of the "acting in concert" theory since, combined with other evidence, three alternative suspects were identified. (Obj. No. 37, pg. 31-32.)

Cox, however, fails to explain why the names of additional suspects would have likely changed his trial's outcome.

Finally, Cox argues that trial counsel could have used DD5 #'s 13 and 16 to impeach Detective Martinez with questions concerning why he did not pursue Sean Edwards as the shooter. (Obj. No. 37, pg. 31-32.)  It is unlikely, however, that any line of questioning in this area would have led to a different verdict since, under the acting in concert theory, the capture of Sean Edwards would not exonerate Cox.

### 2.  Appellate Counsel

Cox objects to the R&R on the grounds that his appellate counsel was ineffective because he (a) failed to raise double jeopardy claims relating to both the second-degree attempted murder and first-degree manslaughter charges, and (b) failed to raise claims that Cox's rights under Antommarchi[21] were violated.

### (a)    Double Jeopardy

The Double Jeopardy clause protects against a second prosecution for the same offense after acquittal and for the same offense after conviction. North Carolina v. Pearce, 395 U.S. 711, 717 (1969); Alabama v. Smith, 490 U.S. 794 (1989).

Cox argues that his appellate counsel was ineffective for failing to raise a double jeopardy claim as to the sufficiency of the evidence that the prosecution presented at Cox's first trial to prove that he committed second-degree attempted murder. People v. Dann, 474 N.Y.S.2d 566, 568 (N.Y. App. Div. 2nd Dep't 1984); Burks v. U.S., 437 U.S. 1, 11 (1978). (Obj. No. 43, pg. 35.)

Cox first argues that the evidence presented by the prosecution at the first trial was legally insufficient to sustain the charge of attempted murder of Darren Dingle since none of the witnesses testified that Cox approached the scene together with Leon Hardy and a third man. (Obj. No. 39, pg. 32-33.)  Second, Cox argues

---

[21] People v. Antommarchi, 80 N.Y.2d 247 (1992).

that Makeda Clarke and Jacquita Tucker testified that they did not see anyone chasing Darren Dingle, and Darren Dingle did not identify petitioner as chasing or firing at him. (Obj. No. 40, pg. 33.)  Third, Cox argues that a charge of attempted murder was sent to the jury at his first trial. (Obj. No. 41, pg. 34.)  Finally, Cox argues that the evidence presented in the second trial was materially different than the evidence presented in the first trial. (Obj. No. 42, pg. 34.)

To show prejudice in the appellate context, "a petitioner must demonstrate that 'there was a reasonable probability that [his] claim would have been successful before the [state's highest court].'" Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994).   While not challenging the sufficiency of the evidence of the first trial, appellate counsel did challenge the sufficiency of the prosecution's evidence in the second trial.  The appellate court found that "the verdict was based on legally sufficient evidence," and that "the credible evidence clearly warranted an inference of accessorial conduct." People v. Cox, 297 A.D.2d 589 (1st Dept. 2002).  The only material differences between the prosecution's case in the first trial and the prosecution's case in the second trial were that Jacquita Tucker did not testify at the second trial and that Makeda Clarke's testimony was less definite in the second trial.[22]  These differences cut against Cox's argument that the evidence was legally insufficient in the first trial and show that the evidence was in fact sufficient.[23]

Cox also argues that appellate counsel was ineffective for failing to raise a double jeopardy claim as to his conviction for first-degree manslaughter. (Obj. No. 44, pg. 36.)  Cox argues that the prosecution dismissed the first-degree manslaughter count before the first trial, requiring the Court to conclude that Cox was tried twice for second-degree murder, a crime for which he was acquitted in the first trial. (Obj. No. 45, pg. 36-37.)  The first trial court's charge to the jury indicates, however, that the first-degree manslaughter charge was not in fact dismissed. (First Trial Transcript ("F. Tr.") at 375.)[24]

---

[22] The first trial refers to the proceedings that commenced in March of 1995, while the second trial refers to the proceedings that commenced in September of 1996 following the hung jury in the first trial.

[23] Cox correctly notes that the charge of attempted murder was sent to the jury in the first trial. (Obj. No. 41, pg. 34.)  The petitioner is required, however, to show prejudice in order for an objection to be sustained.  Here, the appellate court's ruling shows that the evidence in the first trial was sufficient to find the petitioner guilty under this charge. Thus, Cox's claim that double jeopardy applies to the attempted murder charge must fail.

[24] First trial refers to the trial that commenced in March, 1995.

(b)   <u>Antommarchi Claim</u>

Cox next argues that his appellate counsel was ineffective for failing to argue that Cox was denied his right to be present during certain material stages of trial under <u>Antommarchi</u>.  First, Cox argues that he was not afforded an opportunity to respond upon the addition of newly discovered <u>Antommarchi</u> transcripts without conducting a hearing to settle the record. (Obj. No. 48, pg. 37-38.)  Second, Cox argues that his jury misconduct claims warrant setting aside the verdict. (Obj. No. 47, pg. 37.)

The New York Court of Appeals holds that <u>Antommarchi</u> rights can be waived by exhibiting "a voluntary, knowing and intelligent choice." <u>People v. Vargas</u>, 88 N.Y.2d 363, 375-76 (1996).  The R&R correctly held that Cox waived his <u>Antommarchi</u> rights during his second trial.  During his second trial, after the trial court judge informed Cox of his right to be present for sidebar conferences, Cox waived this right. (R&R at 53.)  Cox cannot now claim that appellate counsel's failure to appeal on that ground amounts to ineffective assistance.  That the transcript of this proceeding was not part of the record at the time the Appellate Division denied Cox's appeal is irrelevant, as the waiver is now known and would likely have been uncovered during an earlier appeal, precluding any claim of prejudice for failure to appeal on such grounds. (<u>See</u> R&R at 53 n. 21.)

**D.      Sufficiency of the Evidence / Claim of Actual Innocence**

1.  <u>Sufficiency of the Evidence</u>

Cox objects to the R&R's findings that the evidence presented at his second trial was sufficient to find him guilty of both first-degree manslaughter and second-degree attempted murder and that he failed to meet his burden to prove actual innocence.  A challenge based on the sufficiency of the evidence underlying a conviction must fail if "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 97 (2d. Cir. 1999). "This familiar standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." <u>Herrera v. Collins</u>, 506 U.S. 390, 401-02 (1993).

Cox argues that the evidence presented at his second trial was insufficient to establish a conviction for first degree manslaughter since his presence at the scene is insufficient as a matter of law to establish accomplice or accessories liability. (Obj. No. 49, pg. 39.)  Cox also argues that testimony of Mr. Edwards, P.O. Carson, and Makeda Clarke are insufficient to establish first degree manslaughter. (Obj. No. 50, pg. 39-41.)

Furthermore, Cox argues that the evidence presented at his second trial was insufficient to establish his conviction for attempted murder.  Specifically, Cox argues that there was no evidence that he approached Mr. Dingle and that the witnesses did not testify that both of the persons that approached Mr. Dingle were armed. (Obj. Nos. 51-52, pg. 41.)  Cox also argues that there was insufficient evidence to establish a "community of purpose," required in a conviction based on accessory liability. (Obj. No. 53, pg. 41-44.)

The record establishes that Cox was at the crime scene, that Edwards informed the police that Cox shout him, that a witness saw Cox fire a gun, and that Cox and Leon Hardy, both armed, confronted Edwards and Dingle.  It is the role of the jury, not the federal court considering habeas relief, to weigh evidence and resolve conflicting testimony.  Viewing this evidence in the light most favorable to the prosecution, the Court finds that a rational trier of fact could have found that Cox was guilty of these charges beyond a reasonable doubt. Accordingly, Cox's objections fail.

2.  Actual Innocence

Cox finally argues that he has proven actual innocence. (Obj. No. 54, pg. 44.)  To demonstrate actual innocence, a habeas petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Schlup v. Delo, 513 U.S. 298, 327 (1995). "[T]he Schlup standard is demanding and permits review only in the 'extraordinary' case." House v. Bell, 547 U.S. 518, 538 (2006). Cox relies on affidavits, grand jury testimony, and a line-up sheet to prove that Makeda Clarke was not a credible witness and that during the police investigation, witnesses identified individuals other than Cox as the

perpetrator. (Petitioner's Grounds for Petition, at 4.)  At most, Cox's new evidence helps his case incrementally; it fails to prove that no reasonable juror would have convicted Cox.[25]

## CONCLUSION

For the foregoing reasons, Cox's petition for a writ of habeas corpus is DENIED.  Appellate review is unwarranted because Cox has not made a substantial showing of a denial of a federal right. See 28 U.S.C. § 2253(c)(2).  Accordingly, the Clerk of the Court is directed to enter judgment and close this matter.

Dated: New York, New York
       August 5, 2010

SO ORDERED

PAUL A. CROTTY
United St ates District Judge

**Copy Mailed To:**

Mustapha Lakpene Ndanusa
Tad & Associates
1215 Bedford Avenue
Brooklyn, NY 11216

---

[25] Since Cox has failed to satisfy the Schlup standard his claim of actual innocence under a "freestanding" standard must also fail. See House, 547 U.S. at 555.

23